**Joseph DONNELL, for himself and for all other persons similarly situated, Appellant,**

v.

**GENERAL MOTORS CORPORATION, a corporation, Chevrolet Motors Division, General Motors Assembly Division, United Automobile, Aerospace & Agricultural Implement Workers of America, Local # 25, and International Union, United Automobile, Aerospace & Agricultural Implement Workers of America, Appellees.**

**No. 77-1443.**

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 17, 1978.

Decided May 24, 1978.

James E. McDaniel, St. Louis, Mo., argued, Doris J. Banta, Otis M. Smith and J. R. Wheatley, Detroit, Mich., on brief, for General Motors Corp.

Ralph O. Jones, Intern. Union, UAW, Detroit, Mich., argued, John A. Fillion, Jordan Rossen, M. Jay Whitman and Edwin G. Fabre, Detroit, Mich., on brief, for Intern. Union, UAW and Local No. 25.

Before HEANEY and HENLEY, Circuit Judges, and HANSON, Senior District Judge.*

HEANEY, Circuit Judge.

This appeal arises out of an employment discrimination action brought pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981, against General Motors Corporation (GMC), the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America

---

* The Honorable William C. Hanson, Senior District Judge, Southern District of Iowa, sitting by designation.

(UAW), and Local No. 25. Joseph Donnell,[1] a black, alleged that the defendants discriminated against him with respect to entry into two skilled trades' training programs established by GMC and the UAW. He sought back pay and attorney's fees. After a trial on the merits, the District Court entered judgment for the defendants.

On appeal, Donnell contends that the District Court erred in failing to hold that he established a prima facie case of discrimination with respect to entry into the apprenticeship program and in excusing the defendant unions from liability. We agree and reverse and remand to the District Court for further proceedings.

## I.

Donnell was first employed by GMC at the Chevrolet Division shell plant on Goodfellow Street in St. Louis, Missouri. He was employed at the shell plant until it closed in late 1969. During the last two and one-half years of his employment at the shell plant, he participated in the Employees-In-Training (E.I.T.) program—a skilled trades' training program. He was first classified as a cutter-grinder E.I.T. and next as a machinist-tool room E.I.T.

In May of 1970, Donnell was again employed by GMC, this time at its assembly plant on Union Boulevard in St. Louis. There was no transfer of seniority or job classification from the shell plant to the assembly plant. There were no cutter-grinder or machinist-tool room jobs available at the assembly plant.[2]

During June and July of 1970, Donnell made three applications for entry into the E.I.T. program. There were no formal educational requirements for entry into that program. Entry was determined on the basis of seniority and qualifications, with seniority prevailing absent special qualifications. The District Court found that Donnell was denied entry into the program on the basis of seniority. He does not challenge this finding on appeal.

During July of 1970, Donnell also filed an application for entry into the apprenticeship program established under the national agreement between GMC and the UAW. An applicant must initially satisfy each of the following requirements:

(1) A new employee applicant must be between the ages of eighteen and twenty-six. A seniority employee applicant must be under forty-five.

(2) He must have no disqualifying physical limitations.

(3) He must be a high school graduate with at least a "C" final grade average or at least one year of algebra or geometry with a "C" final grade average. He may also qualify if he has an equivalent education demonstrated by passing the General Educational Development (GED) test.[3] If an applicant meets each of the above requirements, he is granted a personal interview and given an opportunity to take a series of aptitude tests. He is then evaluated and ranked in accord with the point rating system set forth as part of GMC–UAW Standard Apprentice Plan. The collective bargaining agreement provides that

1. The action was denominated as a class action. However, the existence of a class was not pleaded in the complaint nor was class certification sought. Accordingly, the District Court treated the action as an individual one.

2. There were fewer skilled trades' positions available at the assembly plant than at the shell plant. The only skilled trades' classifications were air conditioning and/or refrigeration control, blacksmith, bricklayer, carpenter, electrician, inspector-layout, millwright, painter and glazier, pipefitter, power house-fireman, power house-repairman, tinsmith, tool maker-jig and fixture, tool repair-portable power driver, truck repair-gas and electric, and welder-maintenance-gas and arc.

3. Several revisions, including a relaxation of the educational requirements, were made in the apprenticeship program by the 1973 national agreement between GMC and the UAW. As we held in Parham v. Southwestern Bell Telephone Co., 433 F.2d 421 (8th Cir. 1970):

> While an employer's more recent employment practices may bear upon the remedy sought, they do not affect the determination of whether the employer previously violated Title VII.

Id. at 426.

not more than one non-employee shall be selected for every two employees selected for the program.

Donnell was rejected for failure to satisfy the educational requirements. While Donnell had stated on his written application that he satisfied the educational requirements, he admitted at the preliminary interview, in July of 1970, that he had not, in fact, done so. In March of 1971, Donnell submitted his high school transcript which revealed he had only attended high school for one semester and did not satisfy the educational requirements. He was advised to take the GED test. He did obtain his GED in November of 1971.[4]

II.

At trial, Donnell sought to establish that the requirement of a high school education, or its equivalent, for acceptance into the apprenticeship program violated Title VII and § 1981 because it operated to disqualify more blacks than whites and was not justified as a business necessity. The District Court stated that:

> The Court is presented herein with the unusual circumstance that plaintiff would establish a prima facie case if [the] test were the impact of the requirement upon blacks in general and would not establish a prima facie case if the test were the impact of the requirement upon black applicants. The Court is compelled to conclude that plaintiff has not established a prima facie case.

We are convinced that the District Court erred in interpreting applicant data and that Donnell did establish a prima facie case of discrimination with respect to entry into the apprenticeship program through evidence of the disproportionate impact of the educational requirements upon blacks and evidence of the significant underrepresentation of blacks in the skilled trades and skilled trades' training programs at the GMC assembly plant in St. Louis.

In order to establish a prima facie case of discrimination under Title VII in a case alleging disparate impact, the plaintiff must show only that the facially neutral standard in question selects applicants in a significantly discriminatory pattern. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); *Firefighters Institute, Etc. v. City of St. Louis*, 549 F.2d 506 (8th Cir.), *cert. denied*, 434 U.S. 819, 98 S.Ct. 60, 54 L.Ed.2d 76 (1977). Proof of discriminatory motive or discriminatory intent is not required. *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335 n.15, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); *Albemarle Paper Co. v. Moody*, *supra* 422 U.S. at 422, 95 S.Ct. 2362; *Griggs v. Duke Power Co.*, *supra* 401 U.S. at 430–432, 91 S.Ct. 849; *Firefighters Institute, Etc. v. City of St. Louis*, *supra* at 510. *See generally* Schlei & Grossman, Employment Discrimination Law 1–12 (1976). There is no "inflexible formulation" of what constitutes a prima facie case; it varies with respect to differing factual situations. *International Brotherhood of Teamsters v. United States*, *supra* 431 U.S. at 358, 97 S.Ct. 1843; *McDonnell Douglas v. Green*, 411 U.S. 792, 802 n.13, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Williams v. Anderson*, 562 F.2d 1081, 1088 (8th Cir. 1977).

In this case, the statistical evidence clearly established that the requirement of a high school education, or its equivalent, had a disparate impact upon blacks in the relevant geographical area.[5] *See Green v. Mis-*

---

4. There is a factual dispute between the parties as to whether Donnell submitted his GED test scores to GMC. The scores were needed in order to determine the number of points to be awarded under the point rating system of the GMC–UAW Standard Apprentice Plan.

 At the time Donnell initially applied for the apprenticeship program, he did not satisfy the educational requirements. The fact that he la-

ter obtained his GED does not affect the determination of whether or not he was initially discriminated against.

5. The plaintiff introduced evidence from the St. Louis, Missouri-Illinois, Standard Metropolitan Statistical Area (SMSA). Reliance upon such area-wide data is appropriate in this case in light of the zip code distribution of employees

*souri Pacific Railroad Company,* 523 F.2d 1290, 1293 (8th Cir. 1975). Only 27.9% of black males over fourteen in the St. Louis, Missouri-Illinois, Standard Metropolitan Statistical Area (SMSA) had completed four years of high school in the 1970 census, while 49.1% of white males over fourteen had done so.[6] The median school years completed for black males twenty-five years and older in the St. Louis SMSA is 9.6 years, while the median school years completed for all males in the area is 11.8 years.[7] These statistics can be considered in demonstrating the existence of the disparate impact of the requirement of a high school diploma, or its equivalent, upon blacks. *See, e. g., Griggs v. Duke Power Co., supra* 401 U.S. at 430 n.6, 91 S.Ct. 849; *Johnson v. Goodyear Tire & Rubber Co., Synthetic Rub. Pl.,* 491 F.2d 1364, 1371 n.10 (5th Cir. 1974); *United States v. Georgia Power Company,* 474 F.2d 906, 918 (5th Cir. 1973); *United States v. Ironworkers, Local 10,* 6 FEP Cases 59, 62 (W.D.Mo.1973).

 The defendants object to reliance upon general population statistics from the St. Louis SMSA because two employees must be admitted into the apprenticeship program for every new hire admitted.[8] They contend that the plaintiff should have also introduced evidence of the educational background of plant employees. While evidence as to the educational background of employees would have been desirable, and perhaps more probative, we cannot say that the plaintiff was required to introduce such

evidence under the circumstances of this case. The plaintiff did submit interrogatories requesting information as to the educational background of GMC employees. However, GMC refused to answer them on the grounds that it would have had to examine each employees' personnel file to obtain the date. Since information as to the employees' educational background was in the exclusive control of GMC, the plaintiff could not obtain the information without GMC's cooperation.[9] Absent such cooperation, the plaintiff is entitled to the inference that the educational patterns of the St. Louis SMSA were the same as the educational patterns of the assembly plant employees. Moreover, GMC, as the sole possessor of information as to employees' educational backgrounds, had ample opportunity at trial to rebut the inference of a disparate impact upon blacks of the educational requirements arising from the St. Louis SMSA statistics.

 We recognize that the inference arising from the general population statistics alone probably is not enough to establish a prima facie case of racial discrimination with respect to the GMC–UAW educational requirements, particularly because two-thirds of those accepted into the apprenticeship program were required to be employees. *See Townsend v. Nassau County Medical Center,* 558 F.2d 117, 120 (2d Cir. 1977). In this case, however, the inference is supported by evidence that blacks were

---

which demonstrates that the assembly plant draws upon the entire area for its work force.

**6.** U. S. Bureau of the Census, Census of Population: 1970, Vol. 1, Characteristics of the Population, Part 27, Missouri, Table 148, p. 602.

**7.** *Ibid.*

**8.** The plaintiff contends that it was "improper procedure for the District Court to entertain attempts to defeat the prima facie case rather than move immediately to the question of business necessity." Brief for Appellant, p. 10. We cannot accept this contention. It is well established that "[o]nce plaintiff presents evidence tending to show that the defendant uses a selection procedure which has a substantial adverse impact on a protected group, defendant may elect to attack the adequacy of plain-

tiff's evidence." Schlei & Grossman, Employment Discrimination Law 74–75 (1976), and cases cited therein.

**9.** The plaintiff could have moved to compel answers to the interrogatories under Fed.R. Civ.P. 37(a)(2). The information as to the employees' educational data was undeniably relevant, even to a case of individual discrimination. *Cf. Donaldson v. Pillsbury Co.,* 554 F.2d 825, 832 (8th Cir. 1977). The District Court would have then had the opportunity to judge the burdensomeness of the request for information. However, under the circumstances of this case, we do not believe that the failure to so move should preclude the plaintiff from the benefit of the inference derived from the SMSA statistics.

significantly underrepresented in the skilled trades and skilled trades' training programs at the GMC assembly plant in St. Louis in 1970–1971. In 1971, only five, or 2.5%, of the 203 skilled trades' employees were black; only two, or 11%, of eighteen skilled trades' apprentices were black; and only one, or 4.8%, of twenty-one employees in the E.I.T. program was black.[10] Thus, only 3.3% of those GMC employees in the skilled trades and skilled trades' programs at that time were black.[11] Only .3% of the black employees were in skilled trades while 3.2% of the white employees were in skilled trades' positions. Because of the lack of turnover in the skilled trades, these statistics can be explained in part by pre-Act discrimination.[12] However, the disparity cannot be explained by pre-Act discrimination alone. While the total population of the St. Louis SMSA in 1970 was 16% black,[13] nearly 25% of the assembly plant's approximately 9,500 employees were black in 1971. Because the percentage of blacks in the plant's work force was higher than in the St. Louis area and because of the preference given to employees, it is reasonable to infer that more than eight out of 2,358 black employees would have advanced into skilled trades' positions or skilled trades' training programs absent the existence of discriminatory entrance requirements.[14] This evidence, considered with the SMSA

statistics, established that Donnell met his initial burden of showing that the educational requirements had a disparate impact on black employees at the GMC assembly plant in St. Louis.

The District Court erred in reaching a contrary conclusion by incorrectly interpreting and giving undue weight to applicant data. It held the educational requirements had no disparate impact upon black applicants because 12.4% of the black applicants to the apprenticeship program were rejected for failure to meet the educational requirements and 12.7% of the white applicants were rejected for the same reason. These statistics were derived by combining those applicants rejects for failure to have a high school diploma, or its equivalent, and for failure to meet the "C" grade average requirement. The District Court failed to consider those applicants rejected for failure to submit a transcript or for failure to file more than a preliminary application. In this, the District Court gave undue weight to potentially misleading applicant data since the educational requirements will not only cause completed applications to be rejected, but it will also deter the completion of applications. As the Supreme Court noted in *Dothard v. Rawlinson*, 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977):

There is no requirement, however, that a statistical showing of disproportionate

---

**10.** *See* Amendment to Pretrial Stipulation, filed October 18, 1976.

**11.** We recognize that in subsequent years, the percentage of blacks in the skilled trades has increased. As we noted above, *see* n.3, *supra*, subsequent employment practices may bear upon the remedy, but they are not relevant to the determination of whether the employer had previously violated Title VII. *Parham v. Southwestern Bell Telephone Co., supra.*

**12.** We note that evidence of pre-Act discrimination is not without probative force since it creates the inference that the discrimination continued, particularly when there has been little change in the decision-making process. *See Hazelwood School District v. United States,* 433 U.S. 299, 309 n.15, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977). *Cf.* Fed.R.Evid. 406; *Arlington Heights v. Metro. Housing Corp.,* 429 U.S. 252, 267, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Williams v. Anderson,* 562 F.2d 1081,

1086 n.6 (8th Cir. 1977); 1, 2 Wigmore, Evidence §§ 92, 302–305, 371, 375 (3d ed. 1940).

**13.** U.S. Bureau of the Census, *supra* at Table 23, p. 81.

**14.** In objecting to the use of the SMSA data, the defendants argued that because the assembly plant jobs were "good" ones, it might be expected that a higher percentage of blacks would have a high school diploma, or its equivalent, than those in the general population. The fact that so few blacks moved into the skilled trades' positions which required a high school degree, or its equivalent, tends to negate the defendants' argument. The defendants cannot have it both ways. If more black employees had a high school diploma than those in the general population, then it would be expected that more blacks would have moved into the skilled trades because of the preference given employees.

impact must always be based on analysis of the characteristics of actual applicants. See *Griggs v. Duke Power Co.*, 401 U.S., at 430 [91 S.Ct. 849.] The application process might itself not adequately reflect the actual potential applicant pool, since otherwise qualified people might be discouraged from applying because of a self-recognized inability to meet the very standards challenged as being discriminatory.

*Id.* at 330, 97 S.Ct. at 2727.

*See also International Brotherhood of Teamsters v. United States, supra* 431 U.S. at 365–366, 97 S.Ct. 1843; *Williams v. Anderson, supra* at 1098.

### III.

■ Once a prima facie case of disparate impact is established, then the burden shifts to the defendants to justify the educational requirements on the basis of business necessity. As the Supreme Court has held "[t]he touchstone is business necessity. If an employment practice which operates to exclude Negroes cannot be shown to be related to job performance, the practice is prohibited." *Griggs v. Duke Power Co., supra* 401 U.S. at 431, 91 S.Ct. at 853.[15] The burden has been described as "heavy," *Smith v. Olin Chemical Corp.*, 555 F.2d 1283, 1286 (5th Cir. 1977), and the requirement "must be shown to be necessary to safe and efficient job performance to survive a Title VII challenge." *Dothard v. Rawlinson, supra* 433 U.S. at 331 n.14, 97 S.Ct. at 2728; *Boyd v. Ozark Air Lines, Inc.*, 568 F.2d 50, 54 (8th Cir. 1977); *Head v. Timken Roller Bearing Company*, 486 F.2d 870, 879 (6th Cir. 1973); *United States v. St. Louis-San Francisco Railway Co.*, 464 F.2d 301, 308 (8th Cir. 1972) (en banc), *cert. denied*, 409 U.S. 1116, 93 S.Ct. 913, 34 L.Ed.2d 700 (1973).

The defendants sought to satisfy their burden through the testimony of GMC employees that the skilled trades required specialized knowledge, especially in the area of mathematics, and through two validation studies conducted by GMC. The testimony of the GMC employees as to the need for specialized knowledge was inadequate to establish manifest "job-relatedness." Several courts have rejected similar rationales for high school, or its equivalent, requirements. *See, e. g., Griggs v. Duke Power Co., supra; Pettway v. American Cast Iron Pipe Company*, 494 F.2d 211 (5th Cir. 1973); *United States v. Georgia Power Co., supra*. As Chief Justice Burger noted in *Griggs v. Duke Power Co., supra:*

> History is filled with examples of men and women who rendered highly effective performance without the conventional badges of accomplishment in terms of certificates, diplomas, or degrees.

*Id.* 401 U.S. at 433, 91 S.Ct. at 854.

The high school, or its equivalent, requirement simply did not effectively measure the specialized skills needed for the apprenticeship program.

The validation studies conducted by GMC also failed to satisfy the business necessity test. The validation studies failed to meet the EEOC testing guidelines published at 29 C.F.R. § 1607.1 *et seq.*,[16] which the Supreme

---

**15.** Even if an employer meets the burden of showing that its requirements are job related, the Supreme Court has held that

> it remains open to the complaining party to show that other tests or selection devices, without a similarly undesirable racial effect, would also serve the employer's legitimate interest in "efficient and trustworthy workmanship." [*McDonnell Douglas v. Green*, 411 U.S. 792, 801, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)]

*Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975). We need not reach the question of alternatives since we hold that the defendants failed to justify the educational requirements on the basis of business necessity.

**16.** We recognize that empirical validation has not been required in all cases. *See Boyd v. Ozark Air Lines, Inc.*, 568 F.2d 50 (8th Cir. 1977) (height requirement for pilots); *Townsend v. Nassau County Medical Center*, 558 F.2d 117 (2d Cir. 1977), *cert. denied*, 434 U.S. 1015, 98 S.Ct. 732, 54 L.Ed.2d 759 (1978) (college degree for blood bank technician); *Spurlock v. United Airlines, Inc.*, 475 F.2d 216 (10th Cir. 1972) (college degree requirement for pilots); *Castro v. Beecher*, 459 F.2d 725 (1st Cir. 1972) (high school, or equivalency, or military service requirement for police officers). How-

Court has held are entitled to "great deference." *Albemarle Paper Co. v. Moody, supra* 422 U.S. at 431, 95 S.Ct. 2362; *Firefighters Institute, Etc. v. City of St. Louis, supra* at 510. The basic design of the tests was flawed because neither validation study even attempted to compare the performance of the class of applicants which meet the educational requirement with the performance of the class of applicants which failed to meet the educational requirement. Thus, the studies did not satisfy GMC's burden of establishing a sufficient relationship of the educational requirement to job performance.

■ Accordingly, we hold that the education requirements have not been justified on the basis of business necessity.

### IV.

The District Court excused the defendant unions from liability because

> jurisdiction pursuant to 42 U.S.C. § 2000e *et seq.* does not exist with relation to the International Union because of plaintiff's failure to file charges with the Equal Employment Opportunity Commission against said union. * * *
>
> Plaintiff has totally failed to adduce sufficient evidence of discrimination against him by the union. Plaintiff has also failed to adduce any evidence that the union did not accept, process, or withdraw his grievances in good faith. (Citations omitted.)

We cannot agree that the defendant unions should be excused from liability.

■ While the apprenticeship program is primarily administered by GMC, the rules and regulations of the program are jointly established by GMC and the UAW. Moreover, a joint union-management committee exists at both the national and the local union level to oversee the program. Labor unions, as well as employers, have an affirmative duty to take corrective steps and to insure compliance with Title VII,[17] *Myers v. Gilman Paper Corp.*, 544 F.2d 837, 850 (5th Cir.), *appeal dismissed pursuant to Rule 60* (U.S., August 29, 1977), and a union's role in ratifying a discriminatory practice could be enough to compel a finding of union liability. *James v. Stockham Valves & Fittings Co.*, 559 F.2d 310, 353 (5th Cir. 1977), *cert. denied*, 434 U.S. 1034, 98 S.Ct. 767, 54 L.Ed.2d 781 (1978).

■ Even if jurisdiction under 42 U.S.C. § 2000e did not exist with respect to the UAW International Union, it did exist with respect to Local 25. Moreover, jurisdiction against the UAW International Union still existed under 42 U.S.C. § 1981.

Accordingly, the District Court erred in excusing the defendant unions from liability. On remand, the District Court shall consider the question of the liability of the UAW International Union under 42 U.S.C. § 1981 which involves different standards of proof. *See Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976).

### V.

We turn now to a consideration of the relief appropriate in light of our holding

---

ever, in each of those cases, the job required a high degree of skill and the risks of hiring an unqualified applicant were great. Here, the job requires a lesser degree of skill and the risks of hiring an unqualified applicant are comparatively insignificant. Thus, the employer must satisfy the heavy burden of establishing that the requirement is job related.

Nor is this a situation where the job requirement is so manifestly job related that a business necessity could be presumed. *See Smith v. Olin Chemical Corp.*, 555 F.2d 1283 (5th Cir. 1977) (good back required for manual labor); Recent Decisions, *Title VII—Race Discrimination—Business Necessity as Justification for an Employment Requirement Having a Discriminatory Effect may be Presumed Where the Requirement is so Manifestly Job-Related that it is Patently Neither Artificial nor Arbitrary—Smith v. Olin Chemical Corp.*, 12 Ga.L.Rev. 104 (1977).

17. An argument that a union successfully urged compliance with Title VII does not excuse the union from liability. It instead goes to whether the employer or the union should bear the primary responsibility. *See Myers v. Gilman Paper Corp.*, 544 F.2d 837 (5th Cir.), *appeal dismissed pursuant to Rule 60* (U.S., August 29, 1977).

that Donnell established a prima facie case of racial discrimination with respect to the educational requirements for entrance into the GMC–UAW apprenticeship program and that the requirements were not justified on the basis of business necessity.

## A. *Injunctive Relief.*

■ Since the time Donnell applied for the apprenticeship program, the educational requirements have been relaxed and a significant number of blacks have been admitted. The educational requirements, as modified in 1973, now require that applicants be (1) high school graduates, or (2) have an equivalent education, or (3) have at least one year of algebra or geometry with a final grade average of "C." In 1969, seventeen whites and no blacks were admitted to the program. However, since 1970, eight out of the fifteen entering into the apprenticeship program have been black. The ratio of blacks to whites in the program has also steadily increased. In 1972, only two out of twenty-six, or 7.7%, of the apprentices were black. By December of 1975, four out of nine, or 44%, of the apprentices were black. These changes affect the remedy to be fashioned in this case. *See Parham v. Southwestern Bell Telephone Co.*, 433 F.2d 421 (8th Cir. 1970). Because the educational requirements have been relaxed and because there is no longer evidence of racial discrimination, injunctive relief is not appropriate in this case.

## B. *Individual Relief.*

■ In his complaint, Donnell sought back pay and retroactive seniority.[18] However, Donnell is only entitled to such relief if he demonstrated that he was fully qualified for acceptance into the apprenticeship program. We are unable to determine whether or not Donnell has sufficiently established his qualifications on the basis of this record.

The educational requirements, which Donnell has successfully challenged, were only preliminary requirements for entry into the program. Before an applicant was accepted, further testing, screening and rating procedures were also required under the GMC–UAW Standards Apprentice Plan. Donnell has not challenged these further requirements as discriminatory. Thus, before Donnell is entitled to back pay, he must establish that he has satisfied the further requirements.

Moreover, serious questions have been raised with respect to whether Donnell satisfied the requirement for entry into the program that he have no disqualifying physical limitations. In 1966 and 1971, Donnell suffered neck and back injuries in accidents. These injuries were further aggravated when Donnell suffered head, back and leg injuries when he fell into an open pit at the assembly plant in January of 1972. At the time of trial, Donnell was on extended disability leave, having worked only a total of ninety-five days between 1971 and 1976. The District Court made no findings with respect to Donnell's physical condition at the time of his application. On remand, the District Court shall determine whether Donnell satisfied the requirement of no physical limitations at the time of his application. If it so determines, then Donnell shall be permitted to establish whether or not he can satisfactorily pass the further testing, screening and rating procedures established under the GMC–UAW Standard Apprentice Plan. If Donnell can establish satisfaction of the further requirements, then he is entitled to back pay from the date of his initial application until the date he obtained his GED and would have been entitled to proceed further with the application process. The District Court shall also determine any effect upon such an award because of his subsequent injury and resulting disability.

## C. *Attorney's Fees.*

■ Donnell also seeks an award of attorney's fees. The prevailing party in a

---

18. We note that, in his brief, Donnell seeks to be admitted into the GMC–UAW apprenticeship program. He is now over forty-five-years of age and is presently on an extended disabili-ty leave from GMC. It, thus, appears that Donnell no longer qualifies for the program and his only remedy is back pay.

**1302**

Title VII action is entitled to an award of "a reasonable attorney's fee," 42 U.S.C. § 2000e–5(k), and this Court has awarded attorney's fees to parties prevailing on appeal. *See Firefighters Institute, Etc. v. City of St. Louis, supra* at 516; *Allen v. Amalgamated Transit Union Local 788*, 554 F.2d 876, 884 (8th Cir.), *cert. denied*, 434 U.S. 891, 98 S.Ct. 266, 54 L.Ed.2d 176 (1977). We feel that this is an appropriate case for an award of attorney's fees on appeal as the plaintiff prevailed in establishing that the educational requirements were racially discriminatory and not justified on the basis of business necessity. Accordingly, we award the plaintiff attorney's fees for the appellate portion of this litigation in the sum of $1,000.

On remand, the District Court shall consider the question of attorney's fees for proceedings at the trial court level under the guidelines established by the Fifth Circuit in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–719 (5th Cir. 1974), and approved by this Court. *See Allen v. Amalgamated Transit Union Local 788, supra* at 884.

Reversed and remanded for further proceedings not inconsistent with this opinion.

Costs on appeal shall be assessed against appellees.