471 F.Supp. 1335 (1979)
Ronald RULE et al., Plaintiff,
v.
INTERNATIONAL ASSOCIATION OF BRIDGE, STRUCTURAL AND ORNAMENTAL IRON WORKERS, LOCAL UNION NO. 396 et al., Defendants.
No. 73 C 140(1).
United States District Court, E. D. Missouri, E. D.
June 6, 1979.
*1336 *1337 Louis Gilden, St. Louis, Mo., for plaintiff.
Barry J. Levine, Gruenberg & Souders, St. Louis, Mo., for defendants.

MEMORANDUM
MEREDITH, Chief Judge.
This matter is before the Court on remand from the Court of Appeals for the Eighth Circuit. The opinion of the Court of Appeals is reported in Rule v. International Association of Bridge, Structural and Ornamental Ironworkers, Local Union No. 396, 568 F.2d 558 (8th Cir. 1977) (hereinafter Rule II). In that opinion the Court of Appeals affirmed in part and vacated and remanded in part the ruling of this District Court, which is reported in Rule v. International Association of Bridge, Structural and Ornamental Ironworkers, Local Union No. 396, 423 F.Supp. 373 (E.D.Mo.1976) (hereinafter Rule I).
This action is brought by second amended complaint by Ronald Rule[1] on his own behalf and as representative of a class against the International Association of Bridge, Structural, and Ornamental Ironworkers, Local No. 396 (hereinafter Union), the Ironworkers Joint Apprenticeship Committee of St. Louis, Missouri (hereinafter J.A.C. or apprenticeship program), and the National Ironworkers and Employer Training Program (hereinafter M.T.P.).
Count I of the amended complaint alleged that defendants had discriminated against Rule on account of his race with respect to membership in the Union and J.A.C., employment referrals by the Union and J.A.C., eligibility for training opportunities and apprenticeships by the Union and J.A.C., and by using non-job related criteria as measuring eligibility for the above, all in violation of 42 U.S.C. §§ 1981, 2000e, et seq., and sought monetary damages and injunctive relief. Count II restated these claims as a class action. Count III alleged that the Union had violated a Conciliation Agreement entered into in 1971 by the Union and the Missouri Commission on Human Rights.
In 1971 the United States Department of Justice filed suit pursuant to 42 U.S.C. § 2000e-6 against the Union, J.A.C. and various other construction trade unions in the St. Louis area. United States of America v. International Association of Bridge, Structural and Ornamental Ironworkers, No. 71-C-559(2) (hereinafter the Government case). In November, 1973, the Justice Department entered into a consent decree with the Union and J.A.C. The decree provided, inter alia, that the Union and J.A.C. would not use invalidated tests, would abolish *1338 the wage differential between trainees and apprentices, and would meet established goals of admission and retention of minorities in the apprenticeship program and the M.T.P. The consent decree vests the right to bring an action for noncompliance exclusively in the United States.
By an order dated July 18, 1974, this Court certified this cause as a class action with Ronald Rule as the representative of that class. Subsequently, on December 20, 1974, this Court decertified the class and permitted several individuals to be joined as plaintiffs to pursue their individual claims.
The case was tried to the Court on April 14-16, 1975. On October 6, 1976, this Court rendered its opinion and judgment in favor of the defendants. Rule I, 423 F.Supp. 373 (E.D.Mo.1976). This Court found that plaintiffs were not discriminated against by defendants because of their race. Further, this Court found that plaintiffs did not have standing to contest the Conciliation Agreement or the consent decree and that there was no evidence that defendants were in violation of those agreements.
Plaintiffs timely appealed and alleged that the District Court erred by: (1) decertifying the class action; (2) denying plaintiff's individual claims of racial discrimination; and (3) excluding certain evidence at trial.
On November 22, 1977, the Court of Appeals for the Eighth Circuit rendered its opinion in Rule II, 568 F.2d 558 (8th Cir. 1977). The Court of Appeals remanded the case for consideration of the class claims of racial discrimination and in conjunction therewith ruled that certain depositions and answers to interrogatories (that had been used in the Government case) should be admitted into evidence on the remand proceedings.
As to the claims of individual plaintiffs, the Court of Appeals vacated in part the District Court's order and remanded the following claims for further proceedings: (1) the claims of Coe, Vanderson and Rule that the apprenticeship selection process is discriminatory and (2) the claims of Rule that the negotiation of the Letter Agreement resulted in a racially discriminatory referral system, that the separation of M.T.P. and the apprenticeship program has a discriminatory effect on referrals, and that paying trainees lower wages than apprentices is discriminatory. The District Court's ruling for the defendants was affirmed as to all other individual claims. The District Court's ruling that plaintiffs did not have standing to contest the Conciliation Agreement or the consent decree was also affirmed. The Court of Appeals held, however, that the lack of standing to sue to enforce the consent decree did not apply to challenges to the eligibility requirements for the apprenticeship program.
On December 15, 1978, this Court ordered that this cause be recertified as a class action. The scope of the class consisted of "all black persons who are or who have been members of said defendant Union, J.A.C., and Minority Training Program (MTP), and black persons who are or who have been applicants for membership in said defendant Union, J.A.C. and MTP."
On February 20, 1979, a hearing was held before this Court on the remanded issues. The Court has been duly informed by briefs, exhibits and depositions. The Court makes the following findings of fact and conclusions of law on the remanded issues.
Plaintiffs' individual claims, which are in the nature of pattern and practice claims, will be considered as a part of the class action claims. See Rule II, supra, 568 F.2d at 568 n.15. The remanded issues will be considered separately.

I. The Claims of Coe, Vanderson, and Rule and the parallel class claim that the Union apprenticeship (J.A.C.) selection process is discriminatory.
The Union apprenticeship program, or J.A.C., is a major avenue for entry into the ironworker trade. Prior to 1964 apprenticeship applicants were not required to meet education requirements or take aptitude tests. By 1964 the federal government and civil rights organizations had begun to pressure unions and contractors to increase minority *1339 employment opportunities in the construction industry. Correspondingly, increasing numbers of blacks sought entry into the trade. In 1964, J.A.C. first required a high school diploma or the equivalent, G.E.D., as a prerequisite for entry into the apprenticeship program. In 1965 J.A.C. introduced a battery of aptitude tests to aid in the selection of apprentices.
Prior to the consent decree, the following requirements were necessary for consideration for admission into J.A.C. by an applicant for apprenticeship:
(a) Be between 18 and 30 years of age (special consideration given to men who have been honorably discharged from the armed servicesmaximum age extended to 35 years of age);
(b) Present a doctor's certificate as evidence of physical fitness sufficient to perform the work of the trade;
(c) Be a United States citizen or have made declaration of intent to become same; and
(d) Have a high school diploma or G.E.D.
The consent decree slightly altered the requirements so that now the requirements are:
(a) Be between ages of 18 and 30 (but if a veteran, credit may be given for up to four years' service).
(b) Be physically fit to perform the work of the trade.
(c) Be a high school graduate or have a G.E.D.
(d) Be a citizen of the United States or have made a declaration to become same.
(e) If a test is given meeting the standards set forth, the satisfactory completion of such a test on a pass/fail basis.
(f) Be interested in becoming an ironworker as evidenced by taking an oral interview by membership of the J.A.C.
All J.A.C. requirements have been approved by the Bureau of Apprenticeship and Training, U.S. Department of Labor. J.A.C. gives the Flanagan Industrial Tests to J.A.C. applicants. Pursuant to the consent decree, copies of the tests were sent to the Equal Employment Opportunity Commission (hereinafter E.E.O.C.), and as of the time of trial, J.A.C. had received no protest from that agency.
The number of applicants selected for apprenticeship each year is determined by the joint committee and is dependent upon the anticipated work situation in the area. Neither the union nor the management side of the committee can dictate who is to be indentured as an apprentice nor how many apprentices are to be indentured. An applicant for apprenticeship must accumulate not less than seventy points to be considered eligible for admission into J.A.C. The points obtained from the oral interview, the test, high school diploma or G.E.D., and doctor's statement are all added together to reach a total score. The number of positions that the joint committee determines are available in the apprenticeship program each year are filled with the highest scoring eligible applicants.
The class and Rule contest the validity of the high school diploma or its equivalent as a requirement for eligibility in J.A.C. The class and Coe and Vanderson challenge the use of the Flanagan Industrial Tests as part of the selection process for entrance into J.A.C. Both requirements are asserted to have a disparate impact on black applicants and are therefore violative of Title VII.
From 1965 to 1973, the year the consent decree was entered, the number of minorities admitted into J.A.C. was relatively small.
Pursuant to the 1973 consent decree, J.A.C. has now set aside 15 positions in each class to be filled by minorities if possible. The remainder of the class is then filled by the highest ranking applicants.
Since 1973 blacks have been admitted into J.A.C. in accordance with the consent decree. In 1974, 15 black and 20 white apprentices were indentured. Since 1975 approximately 43 white, 31 black and 6 members of other minority groups have been admitted into J.A.C.
The average test score of the black applicants who were accepted into J.A.C. was 5.3 *1340 on a rating scale of 0-15. The average score for the accepted applicants of other minority groups was 5.0. The average test score of accepted white applicants was about 10.5.
In 1975, approximately 59 white and 11 black applicants were not admitted into J.A.C. The average test score for white applicants not admitted was 5.9. For black applicants not accepted the average test score was 2.3. No members of other minority groups were rejected in 1975.
In 1976, no applicants were accepted into J.A.C. In 1977, only minority applicants were accepted into J.A.C. All minority applicants with acceptable scores who wished to be were indentured in 1977. All white applicants of an undetermined number were rejected. In 1978, about 109 white applicants, 6 black applicants and one applicant of another minority group were rejected. The average test score for these rejected white applicants was about 5.0. The average test score for rejected minority applicants was about 2.5.
Statistical evidence shows that in a five-county area (including the City of St. Louis) within the Union's jurisdiction[2] about 31 percent of black males over 25 had completed four years of high school as of the 1970 census, while about 51 percent of white males over 25 had done so.
Statistical evidence also shows that the total population in the jurisdiction of the Union was about 13 percent black as of the 1970 census.
The evidence also shows that from 1965 to 1978 (the entire period in question), of those applicants accepted into J.A.C. about 15 percent were black or members of other minority groups.[3] Since 1973, when the consent decree was entered, minority applicants have accounted for about 45 percent of those accepted into J.A.C.
Plaintiffs' challenges to the selection process of the J.A.C. must be evaluated according to the standards set forth in Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); Rule II, supra, 568 F.2d at 566. In Griggs, the Supreme Court held that an aggrieved party challenging facially neutral employment qualifications makes out a prima facie case of discrimination by showing that the qualifications in question select applicants in a significantly discriminatory pattern. Griggs, supra, 401 U.S. at 432, 91 S.Ct. 849. Statistical evidence may be used to show disparate effect in a pattern and practice case. Rule II, supra, 568 F.2d at 566.[4] Statistical evidence should be considered in conjunction with evidence of significant underrepresentation of blacks or minorities in the trade and the trade's training programs in the relevant geographical area. Donnell v. General Motors Corp., 576 F.2d 1292 (8th Cir. 1978). Evidence of adequate representation in the trade in more recent years is not relevant to the determination of whether the employer violated Title VII in the past although this evidence may bear on the remedy. Rule II, supra, 568 F.2d at 568; Parham v. Southwestern Bell Telephone Co., 433 F.2d 421 (8th Cir. 1970).
Once the plaintiffs have established that the overall selection process had a disparate effect on minority applicants, the specific elements of the selection process may be scrutinized. Rule II, supra, 568 F.2d at 565.
In this case the evidence shows significant underrepresentation of minorities in the ironworker trade and J.A.C. up until 1973, when the consent decree was entered. Since 1973, the evidence shows compliance with the consent decree and a significant increase in representation of minorities in the ironworkers trade and especially in J.A.C. where blacks have accounted for 45 percent of applicants accepted. There is no evidence of discrimination or disparate impact since 1973. See Smith v. Troyan, 520 F.2d 492 (6th Cir. 1975).
*1341 Although there is no evidence of disparate impact or discrimination since 1973, the evidence does show that before 1973 minority applicants were selected at a much lower rate. This evidence of underrepresentation together with the evidence tending to show that a lower percentage of black applicants than white was accepted before 1973 into J.A.C. is sufficient to establish a prima facie case of discrimination as of that time.
As plaintiffs have established a prima facie case that the selection process as a whole was discriminatory prior to 1973, the Court will turn to specific aspects of the selection process claimed to be discriminatory.
Plaintiffs have established that the high school diploma or its equivalent had a disparate impact on minorities prior to 1973 due to the fact that statistically fewer blacks than whites in the relevant geographical area have met this qualification. Defendants have failed to rebut the prima facie case. Therefore this requirement must fall for eligibility into J.A.C.
Plaintiffs have failed to establish a prima facie case that the use of aptitude tests (specifically the Flanagan tests) had a disparate effect on minorities prior to 1973. Although black applicants have not scored as well as white applicants on these tests, the discrepancy is insignificant and insufficient to support a prima facie case. See Hazelwood School District v. United States, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977).
Plaintiffs also challenge the use of the Flanagan Industrial Tests because they have not been validated as required by the consent decree entered into by the United States and the Union. This Court has already ruled, as affirmed by the Court of Appeals, that the plaintiffs do not have standing to enforce the consent decree. Further, the Union and the J.A.C. submitted the tests to the E.E.O.C., pursuant to the consent decree, which did not object to the use of the tests.
In summary, the Court finds that the selection process for admission into J.A.C. had a disparate impact on black applicants before 1973 and therefore violated Title VII. Specifically, the high school diploma or its equivalent operated to exclude black applicants. This requirement for eligibility must therefore fall. The use of the Flanagan tests did not have a discernible disparate impact on blacks and will therefore stand.
In light of these findings the individual claims of Coe and Vanderson are found to be without merit. Rule's claim is also without merit in light of the fact that he was offered admission into J.A.C. and instead joined the M.T.P.

II. The claims of Rule and the class that the negotiation of the Letter Agreement resulted in a racially discriminatory referral system, that the separation of M.T.P. and the apprenticeship program has a discriminatory effect on referrals, and that paying trainees lower wages than apprentices is discriminatory.
Prior to October, 1972 the Union had no agreed referral procedure. Ironworkers either solicited their own employment or waited in the union hall and obtained jobs when the business manager called for them.
The collective bargaining agreement for the years 1972-1975, or the Letter Agreement, which became effective August 9, 1972, contained the first referral procedure for the Union. The Letter Agreement gave first preference in referral to "Qualified Journeymen"i. e., Union members who had worked at least 6,000 hours in the trade in the Union's territorial jurisdiction.
In November, 1973, the Union's referral procedure was altered by the consent decree. Paragraph 27(4) of that decree gave priority referral status to minorities: "Any minority group person who registers for referral, regardless of union membership or number of hours worked in the trade." The effect of this provision was to place all registered minorities, be they journeymen, apprentices or trainees, in the classification *1342 of "Qualified Journeymen" for purposes of referral and for being allowed to solicit employment. White apprentices and trainees were given a lower priority for purposes of referral.
This Court found that the referral system as it is now applied does not discriminate against blacks. This Court must now determine if the referral system, as it operated under the Letter Agreement between August, 1972 and November 1973 discriminated against blacks. Rule II, supra, 568 F.2d at 568.
Rule and the class claim that the referral procedure under the Letter Agreement, as it operated between August, 1972 and November 1973, discriminated against blacks because of giving priority for referral to journeymen who had worked 6,000 hours. The priority in referral is alleged to have had the effect of freezing the status quo of discriminatory employment practices on the theory that blacks admitted to the Union had not had sufficient opportunity to accumulate 6,000 working hours by 1972. The evidence put forth by plaintiffs in support of this proposition is insufficient to establish a prima facie case as to the effect of the Letter Agreement for the one year.[5] The Court thus finds this claim to be without merit.
As noted above, the Union maintains two programs which are designed to train workers to become journeymen in the ironworker trade. One program is the J.A.C. or the Union's apprenticeship program. Apprentices are Union members but are subject to a variety of restrictions. Apprentices are paid a percentage of journeyman's wages and receive fractional increases at six-month intervals.
The other training program associated with the ironworker trade is the M.T.P. which was established in 1970 to provide training opportunities for minorities and "hard core" unemployed whites who are over the apprenticeable age (usually 30). The great majority of trainees since the inception of the program have been black. Trainees are not Union members and they, like apprentices, receive a percentage of journeyman's wages.
When M.T.P. was started in 1970, it was a four year program and trainees' beginning wage was 50 percent of journeyman's wages, as opposed to the three year apprenticeship program's starting wage of 60 percent. In 1971, M.T.P. was changed to a three year program with a 60 percent starting wage, but the initial six-month incremental raise was 5 percent as compared to an initial six-month incremental raise for apprentices of 10 percent. Incremental raises thereafter for both programs were 5 percent.
Since early 1973, the wages for trainees and apprentices have been identical in all respects including the 10 percent initial incremental raise.
Rule and the class challenge as discriminatory the maintenance of M.T.P. and J.A.C. as separate programs and also challenge the difference in pay between the programs from 1970 to 1973. The allegation that the maintenance of the J.A.C. and M.T.P. as separate programs is discriminatory is based on the premise that J.A.C. has mostly white apprentices and that M.T.P. has mostly black trainees. Because a contractor, in requesting a worker could allegedly request a journeyman, apprentice, or trainee, the separate programs allegedly provide contractors with a vehicle to discriminate against black trainees. In support of their theory plaintiffs have set forth evidence tending to show that black trainees worked fewer hours than white and black apprentices in 1974 and 1975. This claim will be reviewed under the Griggs standard of proof. Rule II, supra, 568 F.2d at 567.
*1343 At the outset of this discussion, it must be noted that since 1973, minorities have accounted for 45 percent of those applicants accepted into J.A.C. In addition, since 1973, all minorities have been granted priority status for purposes of referral. Thus it is hard to see how since 1973 contractors are given an opportunity to discriminate based on the alleged difference in race between trainees and apprentices.
Because of the complex nature of ironworker employment, including such factors as direct personal solicitation of work by journeymen, minority apprentices and trainees, the varied lengths of jobs once obtained, not all workers working regularly, participants in the J.A.C. or M.T.P. programs leaving for various reasons, presence in the Union hall for referral, and requirements of registering for referral, plaintiffs' evidence of hours worked over a span of time is unconvincing of disparate impact and insufficient to establish the prima facie case that the maintenance of M.T.P. and J.A.C. as separate programs is discriminatory. Plaintiffs also adduced no evidence that one group of referral applicants received any more referrals than any other group or that applicants for referral were treated differently within the various referral groupings. It appears from the evidence presented that the Union gave priorities and opportunities to black workers in both the J.A.C. and M.T.P. over white workers. The Court therefore finds that plaintiffs' complaint with respect to the maintenance of J.A.C. and M.T.P. as separate programs to be without merit.
Finally, the Court finds that the difference in wages between the M.T.P. and J.A.C. from 1970 to 1973 had a disparate impact on blacks because at that time M.T.P. was primarily black and J.A.C. was primarily white. This Court has already found that this was due in part to the high school diploma requirement for entry into J.A.C. Plaintiffs have therefore set out a prima facie case of race discrimination. Griggs, supra, 401 U.S. 424, 91 S.Ct. 849. Defendants have not rebutted the prima facie case and thus this Court finds that the wage differential between the J.A.C. and M.T.P. for the years 1970 to 1973, although the difference was minimal after 1971, violated Title VII.

Remedy
This Court finds that between 1967 and 1973 the selection process for admittance into J.A.C. was racially discriminatory by reason of the high school diploma requirement or its equivalent. The Court also finds that the difference in wages paid to trainees and apprentices from 1970 to 1973 was discriminatory. Since 1973 this Court finds that the Union, J.A.C., and M.T.P. operated on a nondiscriminatory basis.
Defendants are hereby enjoined from using the high school diploma or its equivalent as a requirement for admission into J.A.C.
Because there is no evidence of discrimination since 1973, this Court finds that other injunctive relief is inappropriate. See Donnell v. General Motors Corp., supra, 576 F.2d at 1301.
This Court will award back pay to those individuals in the M.T.P. from 1970 to 1973 who would have, except for the lack of the high school diploma or the equivalent, been qualified for admission into J.A.C. This back pay will be equivalent to the pay of apprentices at that time for actual hours worked in those years.
As this Court has found the individual claims of Coe, Vanderson and Rule to be without merit, further individual relief is inappropriate.
The Court finds that attorney's fees are not warranted.
NOTES
[1] Rule's name was changed in 1979 to Walee Abdul Hameed. For the reason of convenience and continuity in the history of this case, Hameed will be referred to as Rule throughout this opinion.
[2] The Union's jurisdiction encompasses 35 counties.
[3] Women are not considered a minority group in this tabulation.
[4] The Court finds that as a whole the way statistical evidence is presented by plaintiffs in this case is incomplete and unconvincing.
[5] The evidence set forth by plaintiffs reveals only how the myriad of factors (date of entry into the trade, regular work in particular years, etc.) that enter into employment in the ironworker trade can result in varied total working hours over a span of time. Plaintiffs have failed to show through their evidence that the race of the individual worker in any way was related to accumulated hours.