464 F.Supp. 138 (1978)
Loretta Lewis RICE, Plaintiff,
v.
The CITY OF ST. LOUIS et al., Defendants.
No. 77-582C(2).
United States District Court, E. D. Missouri, E. D.
December 26, 1978.
*139 Michael J. Hoare, St. Louis, Mo., for plaintiff.
Jack L. Koehr, St. Louis, Mo., for defendants.

MEMORANDUM
WANGELIN, District Judge.
This action challenges defendants' hiring practices with regard to its Public Health Program Representatives (PHPR). Plaintiff alleges that the requirement of a bachelor's degree with specialization in Public Health Psychology, Sociology, or a related field operates to discriminate against blacks and is not job related. The suit is based upon 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-5.
The Court has jurisdiction pursuant to 28 U.S.C. § 1343 and 42 U.S.C. § 2000e-5(f). The following discussion constitutes the Court's findings of fact and conclusions of law.
Plaintiff is a black person who applied for a Civil Service position as a PHPR with the City of St. Louis. The PHPR position was created in 1969 when the former positions that covered the area (Investigator-Venereal Diseases, Informational Aid, Social Worker I, and Sanitarian I) were combined into one position. The positions were consolidated as a result of a survey taken in 1969 which was made in order to redesign the City's class specifications, the various groupings of employment opportunities available within the City of St. Louis. Redesignation was undertaken because job duties and responsibilities within the City had not remained static. Re-classification or the addition of new classes or abolishment of old classes became necessary. The *140 college degree requirement was incorporated into the PHPR class (the Social Worker I position had long required a degree) as the positions consolidated were elevated or upgraded as part of a "natural evolutionary process" seeking to improve public health service to St. Louis residents. The Class Specification Bulletin issued in June of 1969 contained the sentence, "Graduation from an accredited college or university with specialization in public health, psychology, sociology, or a related field." beneath the heading, "Desirable Preparation for Work". Thus, in 1969 when the PHPR class was created, the class specification listed a college degree as desirable rather than necessary. Testimony by a personnel analyst in the examination division of the department of personnel indicated that class specifications as opposed to job descriptions normally listed such requirements in terms of desirable preparation rather than necessary requisites. A job announcement was issued on July 15, 1970 with the same non-mandatory language. It was not until the document promulgated as a job description dated in July of 1973 that mandatory phrasing was used with respect to the college degree requirement.
The testimony disclosed that the apparent reason (aside from the custom of utilizing different phrasing in class specifications as opposed to job descriptions) for the necessary desirable discrepancies was the policy of the health division to allow other employees who had served for some long time in the same or other classes to have a chance to "grandfather clause" themselves in before the requirement of a college education became mandatory. The evidence adduced at trial indicated that two City employees were "grandfathered in" to the PHPR positions around 1970. One of these employees was black.
The elevation of job requirements was co-extensive with job remuneration. In 1970, the starting monthly salary for the new class was $593.77. In July of 1973, when the new opportunity was posted and when the job description phrased the college degree requirement in mandatory terms, the starting monthly salary was listed at $741.00 or approximately $150.00 more.
On or about July 30, 1973, plaintiff Rice applied to the City of St. Louis for consideration in connection with an available PHPR Position. Plaintiff's application for examination was eliminated by the department of personnel for the sole reason the plaintiff did not satisfy the bachelor's degree requirement contained in the examination announcement. Persons who submitted an application for examination in response to the examination announcement for the PHPR position, and whose application for examination contained information reflecting the applicant's eligibility were notified to appear for a written examination. Such applicants were also subjected to an oral examination. If the applicants performed satisfactorily on both they were placed upon an eligibility list for selection with respect to available positions. Eligibility lists remain in force and effect for two years or until the names are depleted, whichever comes first.
After plaintiff's application for examination had been rejected, she filed timely charges of employment discrimination with the Equal Employment Opportunity Commission (E.E.O.C.) and later received a notice of right to sue entitling her to institute this action. The present action was timely filed.
Among other things, plaintiff's application advised the defendants that plaintiff was then employed, and had been for two years, by the Union-Sarah Health Center as an "Outreach worker, public relation lecturer, social service". In response to the directive, "State specifically, what work you did" plaintiff advised defendants, "I do daily the nature of work described in your announcement". Plaintiff's application shows also that plaintiff attended Harris Teachers' College, Washington University and St. Louis University, accumulating some thirty (30) hours of which plaintiff did not know how many were "good".
The evidence showed that while the mandatory degree requirement was interpreted *141 in a rather liberal fashion, screening applicants in, rather than out, the liberal interpretation applied to what constituted a related field rather than the 120 hours of college credits normally required to obtain a degree. Defendants' department of personnel eliminated thirteen (13) applicants because they lacked a bachelor's degree and each of the applicants rejected for failure to satisfy the educational requirement was a black person. Only three (3) individuals have been appointed PHPR's subsequent to the mandatory college requirement. The City of St. Louis currently employs five (5) PHPR's, three of which are black, two are white. Of these five, both a white and a black have been "grandfathered in". Two blacks have degrees, and one white has a degree. Of a total of thirteen (13) former employees, eight (8) were black, five (5) were white. At the time of filing this action, five (5) out of six (6) PHPR's were black. A PHPR position was vacant at the time of trial. Fourteen (14) candidates are eligible for appointment to this vacant position of whom eight (8) are black females.
The theory of plaintiff's case is that the requirement of a college degree is an otherwise neutral factor which has a disparate impact upon the employment of blacks. Albemarle Paper Co. v. Moody, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); Firefighter's Institute, etc. v. City of St. Louis, 549 F.2d 506 (8th Cir. 1977), cert. denied, Banta v. U. S., 434 U.S. 819, 98 S.Ct. 60, 54 L.Ed.2d 76 (1977). Proof of discriminatory motive or discriminatory intent is not required. International Brotherhood of Teamsters v. United States, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); Albemarle Paper Co., supra, 422 U.S. at 422, 95 S.Ct. 2362.
Plaintiff argues that she has made a sufficient statistical showing to shift the burden of proof and require defendants to demonstrate that the educational requirement is a business necessity. In Green v. Mo. Pacific R.R. Co., 523 F.2d 1290 (8th Cir. 1975), the Court said that "a disproportionate racial impact may be established statistically in any of three ways". 523 F.2d at 1293. The tests will be considered seriatim focusing on the evidence established by plaintiff as it applies to each.
The first procedure considers whether blacks as a class[1] are excluded by the employment practice in question at a substantially higher rate than whites. See Griggs, supra, 401 U.S. at 430 n. 6, 91 S.Ct. 849; Green, supra, at 1293. In this case, the statistical evidence established that the requirement of a college degree had a disparate impact upon blacks in the St. Louis area.
Using figures derived from the census track book for the St. Louis standard metropolitan statistical area, (Booklet PHC-1 and various tables therein) plaintiff's expert was able to establish the rate of black educational disadvantage relative to whites. It should be noted that as is usually the case, plaintiff's figures are not unassailable.[2]
If a rate of 1.0 would indicate equality between black and white residents in their *142 eligibility for employment, plaintiff's figures show that the likelihood that a black will have four or more years of college relative to the likelihood that a white will have four or more years of college can be expressed numerically as .55. If the educational requirement were one or more years of college, the numerical likelihood of equality could be expressed as .81. If the educational requirement was a high school education the figure is .90. There is not a rigid formula for determining "disparate impact". International Brotherhood of Teamsters v. U. S., supra, 431 U.S. at 358, 97 S.Ct. 1843; Williams v. Anderson, 562 F.2d 1081, 1088 (8th Cir. 1977). This Court finds that under the statistics established in the present case blacks as a class are excluded by the requirement of a college degree at a substantially higher rate than whites.
The second procedure focuses on a comparison of the percentage of black and white job applicants actually excluded by the employment practice or tests in question. See Griggs v. Duke Power Co., supra, 401 U.S. at 430 n. 6, 91 S.Ct. 849. Green, supra, at 1294.
In this case it is stipulated that all thirteen (13) applicants rejected solely on the basis of the requirement of a college degree were black. The fact that an employer can show, as the defendants did here, that actual employment levels given the employment practice (here the college degree requirement) are not disparate, does not negate plaintiff's prima facie case based upon more general statistics.[3]Cf. Donnell v. General Motors Corp., 576 F.2d 1292 (8 Cir. 1978).
Once a prima facie case of discrimination has been established, the defendants must show that the employment practice in question is justified by "business necessity". Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). The relative function of the academic pre-requisites to job relatedness varies inversely with the risks to the health and safety of the public who depend upon the technology. Townsend v. Nassau County Medical Center, 558 F.2d 117 (2d Cir. 1977); Spurlock v. United Airlines, Inc., 475 F.2d 216 (10th Cir. 1972); Hodgson v. Greyhound Lines, Inc., 499 F.2d 859, 862 (7th Cir. 1974). The Supreme Court has held that the E.E.O.C. testing guidelines published at 29 C.F.R. § 1607.1 et seq. are entitled to "great deference". Albemarle Paper Co. v. Moody, 422 U.S. 405, 431, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). 29 C.F.R. § 1607.5(c)(2)(i) states that:
The larger the proportion of applicants who are hired for or placed on the job the higher the relationship needs to be in order to be practically useful. Conversely, a relatively low relationship may prove useful when proportionately few job vacancies are available . . .
(iii) the smaller the economic and human risks involved in hiring an unqualified applicant relative to the risks entailed in rejecting a qualified applicant, the greater the relationship needs to be in order to be practically useful. Conversely, a relatively low relationship may prove useful when the former risks are relatively high.
As far as this Court can determine only seventeen (17) employees have ever held the position of PHPR. Further, and more importantly, PHPR's are charged with highly sensitive and responsible public health contact work in important phases of City-wide public health programs such as venereal disease, heart disease, immunization or tuberculosis control with duties requiring field work in locating and contacting suspected persons to urge medical treatment and follow-up investigations to insure patients are not neglecting treatment as well as speaking before civic and other community groups concerning health program objectives. To go into a community and contact sexual partners relative to venereal disease treatment requires a high degree of maturity, tenacity, communicative ability and skill. Each position within the PHPR class involves, of course, the performance of different duties, thus job responsibilities differ somewhat among the classes. As the PHPR title itself indicates, all subclasses *143 are directed towards protecting the physical and mental health of the public. The job description describes the nature of the work as:
This is responsible public contact work in a phase of a City-wide public health program such as venereal disease, heart disease, immunization or tuberculosis control; involves field work in locating and contacting suspected persons to urge medical treatment; makes follow-up investigations to insure patients are not neglecting treatment; speaks before civic and other community groups concerning program objectives.
The human risks to health, safety and even life dependant upon competent PHPR performance are great. A college degree while not always absolutely indicative of the knowledge and abilities required to perform such a position has nonetheless been shown in the present case to be substantially job related. In this regard, the Court credits the testimony of Mr. Moore, Dr. Bruce and Mr. Ellis. Certainly the "relatively low relationship" required under 29 C.F.R. § 1607.5(c)(2)(3) has been shown, and this Court finds that the requirement of a college degree is justified on the facts of this case. Judgment will be entered for defendants.
NOTES
[1] The disparate impact upon blacks will only be considered with respect to statistics generated from the metropolitan St. Louis area. The Court feels that the metropolitan St. Louis area is the relevant geographical area in that the City Charter for the City of St. Louis requires that applicants and employees for the type of job presently in issue must live within the City limits.
[2] Plaintiff's statistics are derived from data that is almost nine years old. Plaintiff's expert did, however, testify that more current figures indicate that the proportion of blacks to whites in the City has not markedly changed, rather the projections have indicated major decline in population since 1970 and that black residents have been leaving the City at a rate equal to white residents. Another weakness in the figures is that they are stated in terms of four or more years of college education rather than a college degree. The Court perceives this difference as minor.

The third difference, related to the second, is that the statistics relate only to persons twenty-five years or older. It would thus appear that data relating to persons younger than twenty-five but possessing a college degree has been omitted.
[3] This is the third test in Green, supra.