607 F.2d 791
 21 Fair Empl.Prac.Cas. 81, 21 Empl. Prac.
Dec. P 30,327
Loretta Lewis RICE, on her own behalf and on behalf of
others similarly situated, Appellant,
v.
The CITY OF ST. LOUIS, a municipal corporation, James F.
Conway in his official capacity as Mayor of the City of St.
Louis, R. Elliot Scearce in his official capacity as
Director, Department of Personnel, City of St. Louis, Appellees.
 No. 79-1111.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Sept. 12, 1979.
Decided Oct. 19, 1979.
As Amended Oct. 31, 1979.
 
 Lee T. Lawless, Chackes & Hoare, St. Louis, Mo. (argued), and Michael J. Hoare, St. Louis, Mo., on brief, for appellant.
 Judith A. Ronzio, Asst. City Counselor, St. Louis, Mo. (argued), and Jack L. Koehr, City Counselor, St. Louis, Mo., on brief, for appellees.
 Before BRIGHT, Circuit Judge, MARKEY, Chief Judge,* and HENLEY, Circuit Judge.
 HENLEY, Circuit Judge.
 
 
 1
 This is a case of alleged racial discrimination in public employment brought in the United States District Court for the Eastern District of Missouri pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e Et seq. by Loretta Lewis Rice, a black woman, against the City of St. Louis and certain officers and employees of the City. The suit arose from the fact that in 1973 plaintiff for lack of a college degree was denied consideration for employment by the City as a Public Health Program Representative, hereinafter referred to as a "program representative" or simply as a "representative."
 
 
 2
 Taking the position that the City's requirement of a formal college degree as a condition precedent to consideration for employment as a program representative[1] was not rationally job related and was racially discriminatory, plaintiff filed a complaint with the Equal Employment Opportunity Commission established by the Act. In due course and in the fullness of time plaintiff exhausted her remedies before the agency without obtaining relief and commenced this suit in 1977. The case was assigned to the docket of District Judge H. Kenneth Wangelin.
 
 
 3
 In 1978 the case was the subject of a bench trial before Judge Wangelin, and he denied relief, filing in that connection a memorandum opinion that is published at 464 F.Supp. 138. Plaintiff filed a timely notice of appeal. We affirm.
 
 
 4
 The City maintains a Department of Public Health and Hospitals, and the Department, which we will call simply the Health Department, operates a number of public health programs including without limitation the immunization of people from communicable diseases and the detection, cure and control of venereal diseases in the several forms in which they manifest themselves. The work of some of these people is more exacting and calls for higher employee qualifications than does the work of other programs. For example, the immunization program is relatively simple in that it involves contact of Health Department employees with children, parents and teachers. On the other hand, the program aimed at venereal disease is a more complicated one and requires more highly qualified personnel. Personnel in that program may be required to be in more or less daily contact with persons who have contracted or have been exposed to the diseases in question, with physicians, clergymen and other professional people, and with a substantial number of homosexuals and lesbians, some of whom are said to be found in the learned professions.
 
 
 5
 A person employed as a representative in one of the programs is expected to be able to perform satisfactorily the duties that the program entails and also to explain the program to civic groups such as luncheon or service clubs. Moreover, the City employee may be called upon to engage in conferences and discussions with employees of other agencies including agencies of the federal government. And there is a suggestion in the record that initial employment by the Health Department may be a stepping stone to employment by one of the federal health agencies.
 
 
 6
 The position of program representative was established in 1969 when four separate existing positions were merged into one. Those positions were: Investigator-Venereal Diseases; Informational Aide; Social Worker I; and Sanitarian I. Obviously, some of those positions required more highly qualified employees than did others.
 
 
 7
 Between 1969 and 1973 the City viewed possession of a four-year college degree as a desirable qualification of an applicant for employment as a program representative. However, such a degree was not a mandatory requirement during that period. In addition, some employees who had jobs in the separate categories just mentioned were permitted to become representatives by the operation of a "grandfather clause" adopted by the City in connection with the creation of the new position.
 
 
 8
 In 1973 the position of program representative was upgraded, and the compensation of representatives was increased by about $150.00 per month. At the same time the Department imposed upon all applicants for employment as a program representative a requirement of possession of a college degree. It is that requirement that is challenged here.
 
 
 9
 Plaintiff filed her application for employment in November, 1973; at that time she was a divorcee and was about thirty-four years of age. As indicated, she is a black female. In 1973 she had graduated from high school and had attended classes at Washington and St. Louis Universities and Harris Teachers College in St. Louis. She also had some experience in public health and social work in the black community of St. Louis. Indeed, she had won an award offered in 1965 by one of the St. Louis television stations for a survey that she had conducted for the station for the purpose of determining the effect that educational television was having on the black residents of the St. Louis area.
 
 
 10
 However, plaintiff had no college degree when she applied for employment as a program representative, and while she had thirty hours of college credit, she was not sure that those hours counted validly toward a degree. The lack of a degree was the sole basis on which plaintiff was denied initial consideration for employment.
 
 
 11
 When plaintiff filed her suit in the district court, she sought declaratory, injunctive and pecuniary relief. She also sought to maintain the suit as a class action under Fed.R.Civ.P. 23. The district court found that plaintiff had made a prima facie case of discrimination, but ultimately found that the City had sufficiently justified the imposition of the degree requirement. That view of the case rendered it unnecessary for the trial court to determine whether the suit should be maintained as a class action.
 
 
 12
 In cases arising under Title VII of the Act it is settled by now that where a test or some disqualifying criterion for employment has a disparate and adverse impact on blacks or members of other racial or ethnic minorities, the test or criterion is prima facie discriminatory and illegal, and the burden of justifying it by reference to business necessity or job relatedness shifts to the employer who imposes the requirement.[2] See International Brotherhood of Teamsters v. United States, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); Albemarle Paper Co. v. Moody, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); Donnell v. General Motors Corp., 576 F.2d 1292 (8th Cir. 1978); Green v. Missouri Pac. R. R., 523 F.2d 1290 (8th Cir. 1975); Carter v. Gallagher, 452 F.2d 315 (8th Cir.), Cert. denied, 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1972). Those cases, and others, hold that in the context of Title VII of the Act discriminatory intent need not be shown.[3]
 
 
 13
 In Green v. Missouri Pac. R. R., supra, 523 F.2d at 1293-94, this court held that a disparate impact of a test result or other employment criterion on blacks may be shown prima facie by reference to any one or more of three indicia, namely: the adverse impact of the requirement on blacks as a class in the relevant geographical area; the number of blacks who are in fact disqualified by reference to the requirement; and the number of blacks who meet or are actually hired in spite of the requirement.[4]
 
 
 14
 On the basis of the first and probably on the basis of the second indicium set out in Green the district court found in this case that the plaintiff had made out a prima facie case that shifted the burden of proof to the defendants. That finding was based on the testimony of Dr. Richard E. Ratcliff, Assistant Professor of Sociology at Washington University, and on the fact established by the record that since the degree requirement went into effect in 1973, thirteen persons had been denied consideration for the position of program representative by reference to the requirement, and that all of the rejectees had been black.
 
 
 15
 Before discussing the testimony of Dr. Ratcliff, we will comment briefly about the incidence of rejections by reference to the degree requirement. To start with, it does not follow that after the black applicants had been rejected, white people were hired in the positions sought by the rejectees. The evidence is quite to the contrary.
 
 
 16
 The City does not employ large numbers of program representatives. In fact, only seventeen people have been hired in that job category since it was established in 1969, and ten of them were black. In point of fact after plaintiff's application was rejected, a black woman was hired in the job slot that plaintiff desired to fill. And the district court found that between 1969 and 1970 thirteen people left their positions as program representatives, and that eight of those people were blacks. While the district court acted quite properly in considering the number of blacks who had been rejected by reference to the degree requirement, we doubt that those rejections really prove very much.
 
 
 17
 Coming now to the testimony of Dr. Ratcliff, we observe first that he and the district court viewed the relevant geographical area involved in the case to be the area lying within the corporate limits of the City of St. Louis. That area definition was dictated by the fact that the City Charter provided all City employees of the type involved here had to be residents of the City.
 
 
 18
 Dr. Ratcliff testified on the basis of federal census figures assembled in 1970, that excluded persons under twenty-five years of age, and that took into consideration years of college attendance rather than attainment of a college degree. However, the witness stated that the population of St. Louis had declined since 1970, and that blacks and whites had left the City in about the same proportions. He thus felt, and the district judge seems to have agreed, that the 1970 figures were still relevant. And the district judge did not think that the difference between four years of college work and the attainment of a degree based on college attendance for four years was of great importance. We will accept those propositions.
 
 
 19
 Dr. Ratcliff stated that in 1970 the overall population was about 49% Black and 51% White, or at least non-black. Proceeding, he expressed the view that if one uses the figure "1" to represent the situation in which the degree requirement here challenged would have an exactly equal impact on both whites and blacks, the actual chance that a black resident of St. Louis in comparison with a white resident of the City would have had four years of college work would be only .55. Had the requirement been of one year's work only, the figure for blacks would have risen to .81, and had a high school education been the only requirement, the figure for blacks would have been about .90.
 
 
 20
 The district judge did not make an express finding in terms of the third indicium of Green, supra. He did find, however, that the City has six positions for program representatives. Five of those positions were filled at the time of trial. Three of the representatives were black and two were white; two, one white and one black, had been "grandfathered" into the position. As to the sixth position that was open at the time of trial, the court found that there were fourteen applicants, eight of whom were black females. And there is evidence to the effect that in addition to the eight black women just mentioned, there were two additional black applicants.
 
 
 21
 On the basis of the Ratcliff testimony that has been outlined, the trial judge found that "under the statistics established in the present case blacks as a class are excluded by the requirement of a college degree at a substantially higher rate than whites." And a little further on in his opinion the district judge expressed the view that the City's evidence of actual hirings did not "negate plaintiff's prima facie case based upon more general statistics."
 
 
 22
 However, as has been stated, the district court found ultimately that the City's requirement of a college degree "is justified on the facts of this case." Rice v. City of St. Louis, 464 F.Supp. 138 (E.D.Mo.1978).
 
 
 23
 In making that finding the district judge accepted the testimony of Dr. Helen L. Bruce, a black female physician, who for six years prior to her retirement in 1977, after nearly thirty years of service with the City's Health Department, had been Health Commissioner of the City of St. Louis. The trial judge also accepted the testimony of Mr. Joseph N. Moore, a white man who is employed by the federal Center for Disease Control in Atlanta, Georgia, and who at the time of his testimony was Administrative Chief of the Venereal Disease Control Program of the City of St. Louis. Also accepted was the testimony of Arnold C. Ellis, an employee of the federal Public Health Service who was formerly employed as a program representative by the City.
 
 
 24
 We have given careful consideration to the overall record in the case, to the briefs of counsel on both sides, and to the oral arguments that we have heard. We affirm the ultimate judgment of the district court. There are, however, some comments that we deem it well to make.
 
 
 25
 To start with, we have some trouble with the trial court's initial finding that the plaintiff had made a prima facie case. Primarily, our difficulty is with the statistical base that Dr. Ratcliff used and that the district court seems to have accepted. It will be recalled that that base was the population of the City of St. Louis in 1970, not including what is referred to as the Greater St. Louis Metropolitan Area. According to the census of 1970 the population of the City was 622,236. If the black population was 49% Of the total, there would have been 304,896 blacks residing in the City, and if the white population was 51%, there would have been 317,340 white people living in the City. The use of such a base to determine whether an employment criterion of a municipal agency that has only hired seventeen people over a nine or ten year period is racially discriminatory is highly questionable at best. There appears to be little, if any, record basis for assuming that large segments of either the white or the black population of St. Louis would have been interested in or even generally qualified for a quasi-professional position such as a program representative. Moreover, we suspect, although we do not know, that a black person in St. Louis who is really interested in going into public health work or social work may be as likely to have a baccalaureate degree as is a white person similarly interested. Additionally, we know that the City in connection with its hiring of program representatives has actually hired more blacks than it has whites.
 
 
 26
 However, we will assume, at least for purposes of further discussion, that the trial court was justified in finding that the plaintiff had made a prima facie case. The question, then, is whether the defendants carried the burden of establishing a sufficient justification for the degree requirement as applied to an applicant for employment as a program representative. We are satisfied that the district court was justified in finding that the defendants had carried their burden.
 
 
 27
 The district court recognized, of course, and we recognize that mere possession of a college degree does not qualify a person to be employed in a public health program such as the ones involved in this case. It does not follow, however, that the lack of a degree is irrelevant or that the requirement of a degree is not based on program necessity or is not job related.
 
 
 28
 Program representatives in St. Louis, and particularly those involved in the venereal disease control program, are called upon to engage in tasks that are difficult and taxing. The performance of those tasks in a satisfactory manner requires maturity, "unshockability," persistence and tact; also required is the ability to communicate with others, frequently in a relatively sophisticated atmosphere, and an ability to speak and write intelligibly. Likewise, there is some risk to the public health and safety in the employment of unqualified representatives. Cf. 29 CFR § 1607.5(c)(2).
 
 
 29
 In the last analysis the finding of the district court that the degree requirement was justified by the facts of the case does not stem from an erroneous view of the law, is not arbitrary and capricious and is not clearly erroneous. We accept it.
 
 
 30
 Affirmed.
 
 
 
 *
 The Honorable Howard T. Markey, Chief Judge, United States Court of Customs and Patent Appeals, sitting by designation
 
 
 [1]
 All applicants for employment by the City must take an examination. However, if an applicant fails to meet a threshold objective requirement, such as possession of a college degree, he may not be permitted to take the test. That happened in the case of the plaintiff. She was screened out automatically when it appeared that she had no degree
 
 
 [2]
 When one thinks of a "test," he ordinarily thinks of a series of questions, oral or written, propounded to and to be answered by the person being tested. However, in its regulations under the Act EEOC includes in its definition of a "test" an objective threshold criterion such as the degree requirement with which we are here concerned. 29 CFR § 1607.2
 
 
 [3]
 Compare cases that have arisen under the fifth amendment to the Constitution of the United States and under the equal protection clause of the fourteenth amendment. Those cases include School Dist. of Omaha v. United States, 433 U.S. 667, 97 S.Ct. 2905, 53 L.Ed.2d 1039 (1977); Dayton Bd. of Educ. v. Brinkman, 433 U.S. 406, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977); Village of Arlington Heights v. Metropolitan Housing Dev. Corp., 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); Washington v. Davis, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); Johnson v. Alexander, 572 F.2d 1219 (8th Cir.), Cert. denied, 439 U.S. 896, 99 S.Ct. 579, 58 L.Ed.2d 658 (1978)
 
 
 [4]
 It will be understood that the references to "blacks" apply as well to members of other minority groups who have been or may be the objects of discrimination in employment