**Bessie THOMPSON, Plaintiff,**

v.

**MISSISSIPPI STATE PERSONNEL BOARD, Defendant.**

Civ. A. No. GC 82-203-D-D.

United States District Court, N.D. Mississippi, Greenville Division.

Oct. 5, 1987.

T.H. Freeland, IV, Oxford, Miss., Caroline Moore, Greenwood, Miss., for plaintiff.

T. Hunt Cole, Jr., Sp. Asst. Atty. Gen., Amelia Y. Smith, Asst. Atty. Gen., Joe Gentile, State Dept. of Welfare, Jackson, Miss., for defendant.

## MEMORANDUM OPINION

DAVIDSON, District Judge.

In the instant action Bessie Thompson has sued the Mississippi State Personnel Board asserting that the Personnel Board's requirement that applicants for the position of Supervisor II must have a college degree or two years of college with experience violates Title VII and the Age Discrimination in Employment Act. After a trial on the merits in this action, the court

is now ready to enter its findings of fact and conclusions of law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.

## I. FINDINGS OF FACT

### A. Background

The plaintiff in this action has a high school education and has taken a two-year cosmetology correspondence course. She started working for the Department of Public Welfare with the CETA Program in 1977 as an Administrator IV. Nine months later she was promoted to the program position of deputy director of the CETA program. In 1979 she was promoted to the position of Director V. Thompson held that position until 1981 when the program under which she was working was phased out. She then applied for the position of Supervisor II with the State Personnel Board. Thompson's application was rejected because she did not meet the college education requirements for the Supervisor II position. At the time of her application the plaintiff was 59 years old.

Thompson drew unemployment for three months after being rejected for the Supervisor II position. She was then hired as a hostess at the Greenville, Mississippi Country Club and held that position for three years. Thompson then became manager of the Cleveland Country Club in Cleveland, Mississippi.

After being rejected for the position of Supervisor II, the plaintiff had a discussion with the then EEOC officer at the Department of Public Welfare, Laurie Gervin. Gervin informed the plaintiff of her right to file a complaint with the EEOC. The plaintiff filed that claim and subsequently filed the instant action. She claims that the educational requirements for the Supervisor II position discriminate against women in violation of Title VII of the Civil Rights Act of 1964 (42 U.S.C. Section 2000e et seq.) and that these requirements discriminate against persons who are 40 or older in violation of the Age Discrimination in Employment Act (29 U.S.C. Section 621 et seq.)

At the time of the plaintiff's application the State Personnel Board required that applicants for the Supervisor II position have a bachelor's degree from an accredited four-year college or university and one year of experience in a human service agency in a position that involved the provision of services to clients, or completion of two years of college with three years of experience.

The Personnel Board has described the characteristics of the Supervisor II position as follows:

> This is social work of a supervisory nature at the county or regional level. Work involves the supervision of full-time service staff with responsibility for intake work in providing services to adults, families and children, supervision and planning for the use of subprofessionals and volunteers, orientation and training of workers, and assisting the County Director with community and inter-agency activities. Incumbents in this position insure that acceptable standards for social services to adults, families, and children are maintained, that utmost use is made of community resources, that intake standards are maintained, and that all facets of the social service program are coordinated with other agency programs. Work is performed under the administrative supervision of the County Welfare Director, with technical supervision from the Supervisor III.

The responsibilities of a Supervisor II include supervision and evaluation of that supervisor's staff; assignment of work to members of the staff; interpretation and execution of policies and procedures of the Department of Welfare; review of work by the social service staff and intake staff; conducting training programs to increase staff competence and to improve staff performance; and participation in various other administrative and developmental activities.

Barbara Rayburn, an experienced social worker, met the educational requirements for the Social Worker II position and was hired for that position. Rayburn was 42 years old at the time she was hired, pos-

sessed a bachelor's degree and had completed some graduate work. Most Supervisor II positions are filled by people who have previously worked as social workers. Rayburn testified that as a Supervisor II she uses her former experience as a social worker in making judgment calls on how to handle certain cases. The social worker position has a college degree requirement.

Rayburn testified that as Supervisor II she supervises social services programs, particularly the protective services program. This program protects adults and children from abuse, neglect, and exploitation. Whenever a case of abuse, neglect, or exploitation is reported, the Supervisor II is responsible for assigning a social worker to the case and taking a direct hand in all phases of the social worker's activities, except for routine matters.

The position of Supervisor II is very interrelated with the position of social worker. Rayburn testified that a Supervisor II may sometimes be involved directly in the investigation of a case and is required to make discretionary decisions based on the investigation. A social worker who has investigated the case prepares a written report and submits it to the Supervisor II. The Supervisor II then has final authority on whether to approve the social worker's recommendation as to how the case should be handled or to proceed in another manner.

The position's responsibilities require that the supervisor be a skilled communicator. A Supervisor II's responsibilities may involve having to petition the youth court for certain legal action and may require the Supervisor II to testify in court. Rayburn testified that a Supervisor II also has the authority under certain circumstances to decide whether to take a child from the child's home without a court order. This may occur in emergency situations when there is no time to get a court order.

Rayburn stated that the position requires that the supervisor have great assessment skills and be able to make informed judgment calls. Rayburn further testified that a Supervisor II has final responsibility in the placement services that the welfare department provides. A Supervisor II has the responsibility of approving or disapproving homes in which victims may be placed. The Supervisor II also supervises services to unmarried parents.

As a Supervisor II in Washington County Rayburn supervises ten social workers, nine aids and one general service employee. Her responsibilities as Supervisor II include training social workers, introducing the social workers to the policies of the department and clarifying departmental policies. The Supervisor II also must conduct performance appraisals of the social workers who work under her and must correct errors that the social workers have made.

### B. Work Force Data of Supervisor II Position

### 1. Impact of Educational Requirement

The following table depicts the work force composition of the Supervisor II position in 1981 and at present:

| Date | Total Workers | No. of Males | No. of Females | No. 40 or Over | No. Younger than 40 |
|------|---------------|--------------|----------------|----------------|---------------------|
| April 1981 | 22 | 2 | 20 | 12 | 10 |
| 1987 | 53 | 6 | 47 | 27 | 26 |

This information reveals that there is a substantially greater number of women who fill the position of Supervisor II than there are of men. Also, the Supervisor II position is composed of more people who are 40 years of age and older than of people who are under the age of 40. No evidence was submitted at trial that the work force composition of the Supervisor II position was due to any affirmative action program implemented by the Personnel

Board.[1] Nevertheless, the plaintiff contends that the defendant's employment practices have an adverse impact on women and individuals 40 years of age and older.

Both parties submitted expert testimony concerning the impact that the educational requirement has on the Supervisor II work force and the job relatedness of the requirement.

The plaintiff's first expert, Dr. John Marcum, Jr., a demographer, stated that he studied applications for state jobs submitted in 1979 and 1980.[2] He proceeded upon the theory that many who did not have a college degree did not apply for the position of Supervisor II because they were aware of the educational requirement and thought that the application process would be futile. Based on this assumption, he concluded that the proper pool to study was all applications for state jobs, not just those applications for the position of Supervisor II. During the two-year period that he studied, 13,000 applications were submitted for state jobs. Marcum used a sampling procedure whereby he took a representative number of the applications to analyze. Out of this sample Marcum looked at the sex, age and years of education of those applicants.

A total of 304 women and 128 men from the sample applied for state jobs. Of these, 134 women met the Supervisor II qualifications while 88 men met the qualifications. Marcum found qualification rates of 44.08 percent for women and 68.75 percent for men. These rates show that the qualification rate for men is over 22 percent higher than it is for women.

Marcum also evaluated the qualification rate for women over 40 as opposed to men over 40. Although Title VII prohibits discrimination based on sex[3] and the ADEA prohibits discrimination based on age as to all individuals who are at least

---

**1.** The plaintiff asserts that the court should not consider the fact that more women than men apply for and occupy the Supervisor II position because this evidence is "bottom line evidence." The plaintiff cites *Connecticut v. Teal*, 457 U.S. 440, 102 S.Ct. 2525, 73 L.Ed.2d 130 (1982) as authority for this proposition. In *Teal*, the Supreme Court held that where a barrier exists that disproportionately causes persons in a protected group to be denied employment opportunities, the fact that the addition of an intervening element results in an appropriate balance in the work force does not affect the plaintiff's prima facie case of disparate impact as to that barrier.

In *Teal*, plaintiffs were required to pass a written examination before attaining permanent status as Welfare Eligibility Supervisors. The test was taken by 329 candidates, 48 of whom were black and 259 of whom were white. Blacks passed the test at a rate of 54.17 percent, while whites passed at a rate of 68 percent. The defendant did not deny that the examination itself resulted in a disparate impact on blacks. Approximately one month prior to trial, however, the defendant made promotions from the eligibility list of individuals who passed the exam. In making these promotions, the defendant applied an "affirmative action program" so that a higher percentage of blacks than whites were made permanent supervisors. The defendant asserted that because the bottom line result of the promotion process was more favorable to blacks than whites, the examination could not be held to have a discriminatory impact on blacks.

The Supreme Court rejected the defendant's argument and held that if a barrier has an adverse effect on a protected group of applicants, then individual applicants in that group have been deprived of an employment opportunity in violation of Title VII, regardless of whether other procedures have been employed so that there is adequate representation of the protected group at the bottom line. 457 U.S. at 448, 102 S.Ct. at 2531, 73 L.Ed.2d at 137–38.

In the case *sub judice*, there was no intervening element as there was in *Teal* that caused the Supervisor II work force to have an appropriate balance of workers from protected groups. In this case, unlike *Teal*, there was adequate representation of people within the plaintiff's class who applied for the Supervisor II position, met the minimum requirements, and occupied the position. There has been no impact against a protected class either at the initial qualification stage or at the bottom line. Thus, the court sees no reason to exclude evidence concerning the number and percentage of women applicants, of women who have met the minimum qualifications or of women who occupy the Supervisor II position.

**2.** The court notes however, that this pool of state job applicants excludes all applicants for teaching positions in public schools. Consequently, many applicants for public jobs who possess college degrees were not included in this study. It did include, however, all applicants who applied for secretarial, receptionist, custodial, and clerical positions.

**3.** *See* 42 U.S.C. Section 2000e–2.

40,[4] neither statute recognizes the subset of women over 40 as being protected from adverse treatment as opposed to men over 40. Thus, the plaintiff's statistical data showing the different qualification rates of women over 40 and men over 40 without any data as to men and women younger than 40 is not probative in proving age discrimination.

In applying the ⅘ths rule to the sample from the pool of all applications for state jobs, Marcum found that the percentage of women who qualified (44.08 percent) for the Supervisor II position divided by the percentage of men who qualified (68.75 percent) equaled 64.12 percent. Since this number is less than 80, Marcum concluded that the education requirement for the Supervisor II position has an adverse impact on women. Marcum also tested for statistical significance and found that the difference between the qualification rates for the two groups was statistically significant and therefore indicated adverse impact on women.

Marcum also calculated the qualification rate for men and women with two years of college education. The rate was 52.4 percent for women and 77.8 percent for men. Application of the ⅘ths rule to these rates also resulted in a showing of adverse impact on women.

■ Next, Marcum calculated the qualification rates for men over 40 and women over 40. He did not testify concerning the qualification rates of all applicants 40 years of age and older as opposed to all applicants younger than 40. The court finds that the relevant comparison should have been between the qualification rates of all applicants 40 years of age and older and all applicants younger than 40. Consequently, Marcum's calculations concerning the difference between men over 40 and women over 40 may not be considered as a probative of age discrimination.

Marcum additionally analyzed a 5 percent sample of people between 21 and 65 from the 1980 Mississippi census data in terms of sex and college education. He

stated that the qualification rates using the ⅘ths rule with this pool were fairly similar to the rates found with the state job applicant pool.

In evaluating the impact of the education requirement on the protected groups at issue, the expert for the defendant, Dr. David Morris, made a study of applications that were actually submitted for the Supervisor II position. Morris was of the opinion that Marcum had used inappropriate pools as the basis of his study. Morris testified that in determining whether the educational requirement has an adverse impact on certain applicants for the Supervisor II position, the proper pool to evaluate is the pool of all applicants for that position. Morris testified that the pools that Marcum used for analysis are not as reliable as actual applicant flow data for the Supervisor II position in determining adverse impact because with those pools, individuals who are not interested in the job are included in the analysis. Morris stated that the pools upon which Marcum based his study should not be used unless there is an indication that something in the minimum qualification would preclude protected groups from applying in the proportion that would otherwise have been expected. The witness referred to this barrier as a "chilling effect." Morris stated that from viewing the pool of Supervisor II applicants there was no reason to think that the educational requirement had a "chilling effect" on women or people 40 years of age or older. In fact, many more women apply for the Supervisor II position than do men. Because of the lack of indications of a chilling effect, Morris limited his study to the actual applicants for the Supervisor II job.

Morris studied the disapproved applications for the period of January 1981 to present and studied the approved applications from November 1982 to present. Morris found a total of 231 applications for the Supervisor II position. These applicants were classified as to their age and sex. The following table indicates the make-up of this applicant pool:

4. *See* 29 U.S.C. Sections 623 and 631.

|  | Number | % |
|---|---|---|
| Female | 149 | 64.5 |
| Male | 82 | 35.5 |
| Total | 231 | 100.0 |
| 40 years and over | 33 | 14.35 |
| Under 40 | 197 | 85.65 |
| *Total | 230 | 100.00 |

*The difference of one less in totals was due to missing age data for one of the applicants.

As the table indicates, substantially more women than men applied for the Supervisor II position. Substantially more people under 40 applied for the position than did people 40 years of age and older.

Thirty of the 231 applicants for the Supervisor II position did not meet the minimum educational requirements. Nineteen of these 30 were female and 11 were male. Three of the 30 were 40 years of age or older, and 27 were under the age of 40.

After conducting a chi-square contingency test on the relationship between the sex variable and meeting minimum requirements for the Supervisor II position, Dr. Morris found that the relationship is non-significant. Dr. Morris's study indicates that there is little, if any, difference between the pattern of males and females who met and failed to meet the minimum requirements for the Supervisor II position. Morris concluded from this study that the educational requirements had no adverse impact against females or males.

The following table indicates the relationship between males and females in meeting the minimum qualifications for the Supervisor II position:

|  | Met Minimum Qualifications | Did not meet Minimum Qualifications | % that did not meet Qualifications | Total No. of Applicants |
|---|---|---|---|---|
| Male | 71 | 11 | 13% | 82 |
| Female | 130 | 19 | 13% | 149 |
| Total | 201 | 30 | 13% | 231 |

(Chi-squared observed = .004)
P .05

As the table indicates, there is no significant difference between the percentage of women who did not meet the minimum educational qualifications and the percentage of men who did not meet these qualifications.

Dr. Morris also conducted a chi-square analysis on the relationship between age and meeting the minimum requirements for the Supervisor II position. Morris divided the age groups into two groups: those 40 years of age and older, and those under 40. A chi-square test is used to indicate whether or not either of these two age groups is favored by the minimum requirements. A significant chi-square would indicate favoritism. After doing the analysis Morris found that the chi-square was non-significant and therefore did not show favoritism based on age. The following table shows the result of Morris'. analysis.

Chi-Square Test on Relationship Between Age and
Meeting Minimum Requirements

| | Met M.Q.'s | Did not meet M.Q.'s | % That Did Not Meet M.Q.'s | Total |
|---|---|---|---|---|
| 40 and above | 30 | 3 | 9% | 33 |
| Under 40 | 170 | 27 | 14% | 197 |
| Total | 200 | 30 | 13% | 230 |

(Chi-squared observed = .202)
P .05

As the table indicates, the educational requirement actually had a greater impact on those applicants younger than 40 than it had on the applicants who were 40 or older.

Morris also conducted what is known as the "⅘ths rule" or the 80 percent rule. This test is used as a guide to determine whether a job requirement may have an adverse impact upon a certain group. The 80 percent rule is used by first determining the number of men and woman who met the minimum educational qualifications and then dividing the larger number into the smaller number. The resulting ratio is then multiplied by 100. If the result is 80 percent or larger, no adverse impact is indicated. If use of the ⅘ths rule results in a number under 80, adverse impact is indicated. The results of the ⅘ths rule to the applicants for the Supervisor II position are indicated as follows:

80% Rule Test on Minimum Requirements
and Sex of Applicant

$$\text{Pass rate for females} = \frac{130 \text{ passed applicants}}{149 \text{ total applicants}} = .872$$

$$\text{Pass rate for males} = \frac{71 \text{ passed applicants}}{82 \text{ total applicants}} = .866$$

$$80 \text{ percent rule} = \frac{.866}{.872} \times 100 = 99\%$$

After conducting this test Morris concluded that the 80 percent rule calculation indicates that there is no adverse impact to women by requiring a college education for the Supervisor II position.

A ⅘ths rule calculation was also done as to individuals 40 years of age and older and as to those younger than 40. The following table shows the result of that calculation:

80% Rule Test on Minimum Requirements
and Age of Applicant

$$\text{Pass rate for 40 years and older} = \frac{30 \text{ passed applicants}}{33 \text{ total applicants}} = .909$$

$$\text{Pass rate for under 40 years} = \frac{170 \text{ passed applicants}}{197 \text{ total applicants}} = .863$$

$$80 \text{ percent rule} = \frac{.863}{.909} \times 100 = 95\%$$

A higher percentage of applicants 40 years of age and older met the minimum qualifications than did applicants under 40. The ⅘ths rule calculations indicated no adverse impact as to applicants who were 40 years of age and older.

Dr. Morris' conclusion from the study was that there was no adverse impact caused by the educational requirements on females or on those aged 40 or older.

2. Job Relatedness

Dr. Eric Prien, an industrial psychologist, testified concerning the job-relatedness of the college education requirement to the Supervisor II position. Prien had not studied the Supervisor II position or interviewed any individuals holding that position, but had seen a narrative description of the job. Based on this job description, Prien was of the opinion that the college education requirement does not validly relate to the needs of the Supervisor II position but is simply a barrier so that fewer people will apply for the job. Prien was of

the opinion that alternative qualifications to the college education requirement could be used as a better measure of an applicant's achievement. Prien based his opinion in part upon the fact that the field of study for the college education required for the Supervisor II position is not specified. Prien reasoned that if the college field of study were specified, the attainment requirement would be connected to the achievement that is necessary for the job.

Prien was further of the opinion that the potential dangers of hiring an unqualified person for the Supervisor II position were not critical.

Dr. Morris also testified concerning the job-relatedness of the educational requirements. He testified that he is personally familiar with the Supervisor II position. In 1977 his firm conducted a validity study at the Department of Public Welfare as to social workers and eligibility workers. These workers are supervised by the Supervisor II and the Supervisor II actually participates in much of the work that these employees do. After receiving the results of a position analysis questionnaire and doing a task analysis study on the social workers and eligibility workers, Morris concluded that a college degree is necessary for the position of Supervisor II and enhances the professionalism of that position.

Morris found from his study that the duties of the Supervisor II include assigning work, evaluating performance of social workers, training personnel, resolving complaints, monitoring and certifying the type of aid to be given, classification of clients, and interpretation of policy to workers. Morris testified that in order for Supervisor II to be able to accomplish all of these tasks and actually to participate in the activities of the social worker, the Supervisor II needs at least the knowledge, skills and abilities that a social worker has. Morris stated that the demands of the Supervisor II position include that the Supervisor II have a strong reading comprehension, a broad base of knowledge, oral and written communication skills, ability to identify problems, and ability to take in and digest large amounts of information quickly. Morris stated that college training enables one to develop these skills. He stated that college training broadens one's knowledge base and requires one to read material that is more complex than that that is read in high school. Morris stated that if the educational requirements were eliminated, the number of individuals who could not perform the required work (false positives) would increase and the degree of professionalism would decrease.

Morris was of the opinion that a substantial risk of critical consequences would exist if the educational requirement for the Supervisor II position were reduced. He based this opinion on his familiarity with the Supervisor II position and on particular factual situations of which he was aware. After evaluating the Supervisor II position, Morris concluded that college training is a sound requirement for the job.

### C. Court's Factual Findings as to Work Force Data

#### 1. *Proper Pool and Impact on Women*

In looking at the actual applicant pool for the Supervisor II position, the court notes that the percentage of female applicants for the position (64.5%) is substantially higher than the percentage of male applicants (35.5%). There is no evidence in the record upon which the court may rely in inferring that otherwise qualified women were discouraged from applying for the Supervisor II position because of a self-recognized inability to meet the educational requirement. Indeed, the high percentage of female applicants for the position indicates that the educational requirement did not discourage otherwise qualified women from applying. *Compare Dothard v. Rawlinson,* 433 U.S. 321, 330, 97 S.Ct. 2720, 2727, 53 L.Ed.2d 786, 798 (1977); *cf. Williams v. Owens–Illinois, Inc.,* 665 F.2d 918, 925 (9th Cir.1982) (actual applicant flow suggested as being accurate indicator of relevant markets, "at least where there is no evidence of systematic discouragement of minority applicants"). The court finds that the pool of actual applicants for the Supervisor II position is a more accurate indicator of the impact on

the employer's work force of the education requirement than is the pool of all applicants for all state jobs. The pool of all applicants for all state jobs does not include applicants for public school teaching positions [5] and does not take into account whether those who applied for the various state jobs would have been interested in the Supervisor II position. Also, even if the college education requirement did not exist for the Supervisor II position, applicants would still have to have at least one year of human service experience. The pool of applicants for all state jobs does not take into account whether those individuals met that requirement. These deficiences make the plaintiff's statistical proof unacceptable for determining disparate impact in this case.

■ Based on the number and percentage of women applicants for the Supervisor II position and on the equal percentage of men and women applicants who met the minimum educational qualifications for the Supervisor II position (*see* table, *supra* at 206), the court finds as a matter of fact that the college education requirement does not adversely affect women.

### 2. *Proper Pool and Impact on Individuals 40 Years of Age and Older*

■ The applicants for the Supervisor II position who were 40 years of age and older were substantially out-numbered by the applicants who were younger than 40. Only 33 of the 230 applicants were older than 39. This disparity could be some evidence that otherwise qualified individuals who were over 39 may have been discouraged from applying for the Supervisor II position because of the education requirement. Even if this were so, the court finds that the defendant's statistics concerning the actual applicant pool are more reliable in determining the impact of the education-

al requirement on individuals 40 years of age and older than are the plaintiff's statistics. The plaintiff submitted statistical data from the pool of applicants for all state jobs concerning the different rates at which women over 40 and men over 40 meet the college education requirement. The plaintiff did not submit statistical evidence from the state jobs pool concerning the different rates at which all individuals over 40 meet the educational requirement as opposed to all individuals younger than 40. Thus, the court finds that the plaintiff has not submitted evidence that the education requirement has an adverse impact on individuals who are 40 years of age and older. A comparison of women and men over 40 does not support an age discrimination claim.

The court further notes that although substantially fewer individuals over 39 applied for the Supervisor II position, the percentage of these individuals that met the educational requirement was higher than the percentage of individuals younger than 40 that met the requirement.

Based on this evidence, the court finds as a matter of fact that the college education requirement for the Supervisor II position does not adversely impact individuals 40 years of age and older.

## II. CONCLUSIONS OF LAW

■ The plaintiff's Title VII and ADEA claims against the defendant are based upon a disparate impact theory.[6] To establish a prima facie case of disparate impact, a plaintiff must identify a facially neutral employment practice or requirement that has the effect of disqualifying a disproportionate number of members of a protected class from employment opportunities. *Connecticut v. Teal,* 457 U.S. 440, 446, 102 S.Ct. 2525, 2530, 73 L.Ed.2d 130

---

**5.** In the 1980–81 school year there were 25,502 public school teachers in Mississippi, 20,062 of whom were female.

**6.** The state strongly argues that the disparate impact theory of discrimination may not serve as a basis of liability in ADEA actions. The Court of Appeals for the Fifth Circuit has not directly ruled on this issue. In the instant case,

the court is of the opinion that it is not necessary to decide this legal issue because the court finds that even if the disparate impact theory may be used in age discrimination cases, the plaintiffs have not shown that the defendant's employment practice of requiring college education caused a disparate impact on persons at least 40 years of age.

(1982); *Bunch v. Bullard*, 795 F.2d 384, 392 (5th Cir.1986). Once a plaintiff has made out a prima facie case, the burden then shifts to the employer to prove that the challenged employment practice that operates to exclude a larger portion of a protected class is related to job performance. *Walls v. Mississippi State Department of Public Welfare*, 730 F.2d 306, 315 (5th Cir.1984); *Carpenter v. Stephen F. Austin State University*, 706 F.2d 608, 621 (5th Cir.1983). If the employer proves that the employment barrier is job-related, the plaintiff then may still be able to show that the barrier is "a mere pretext for discrimination." *Bunch*, 795 F.2d at 393. The plaintiff may show that other adequate selection devices are available that do not have a discriminatory effect against a protected class. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975).

### 1. *Prima Facie Case*

█ The use of mere statistical information or census data indicating that fewer people within a protected class possess a challenged educational requirement than people outside a protected class "is not sufficient to indicate the disparate impact of that requirement." *Walls v. Mississippi State Department of Public Welfare*, 542 F.Supp. 281, 310 (N.D.Miss.1982), *aff'd in part, rev'd in part*, 730 F.2d 306 (5th Cir. 1984). Rather, there must be a showing that the facially neutral selection criterion is causally connected to an imbalance in employment opportunities within the particular defendant's work force. *See Carroll v. Sears, Roebuck & Co.*, 708 F.2d 183, 189 (5th Cir.1983). If the plaintiff fails to prove the causal connection between the educational requirement and actual disparities in employment opportunities within the defendant's work force, then the court must find that there is no disparate impact on the protected class.

█ Under the facts of the case *sub judice*, the plaintiff must show that the college education requirement for the Supervisor II position operates more harshly on women and/or on people 40 years of age

or older than on men and/or people under 40. Statistical evidence based on the pool of all applicants for the Supervisor II position shows that women have met the educational requirement for the position at the same rate that men have met the requirement. (*See* table, *supra* at 205). Individuals 40 years of age and older met the educational qualification at a higher rate than did individuals younger than 40. (*See* table, *supra* at 206.) Based on this information, the court has found that the educational requirement does not have a disparate impact on women or on people 40 years of age and older. Accordingly, the court is of the opinion that the defendant's educational requirement is not in violation of Title VII or the ADEA.

### 2. *Job Relatedness*

"The threshold inquiry, and the trigger of the employers' burden to prove job relatedness, is whether the plaintiff[ ] ha[s] shown that the [educational requirement] in question select[s] applicant[s] for hire or promotion in a racial pattern significantly different from the pool of applicants." *Bunch*, 795 F.2d at 395. Since the plaintiff in this case has not made this showing and consequently has not made out a prima facie case, the court finds that the defendant does not have to prove that the college education requirement for the Supervisor II position is job-related.

Even if the plaintiff had shown disparate impact, the court is nevertheless of the opinion that the defendant's proof has sufficiently shown that the college education requirement has a manifest relationship to the requirements of the Supervisor II position. In determining the extent of job-relatedness that must be shown by the employer, this court is guided by the decision of the Court of Appeals for the Fifth Circuit in *Davis v. City of Dallas*, 777 F.2d 205 (5th Cir.1985) *cert. denied*, 476 U.S. 1116, 106 S.Ct. 1972, 90 L.Ed.2d 656 (1986). In *Davis*, the Court of Appeals for the Fifth Circuit examined the job-relatedness defense in disparate impact suits. The court noted that in prior Supreme Court and Fifth Circuit cases in which educational

requirements were struck down, the positions at issue were skilled laborer positions. *See Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971) (high school diploma or intelligence test passing grade was condition to employment in skilled labor jobs); *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975) (skilled laborers required to have high school diploma and pass two intelligence tests); *Watkins v. Scott Paper Co.*, 530 F.2d 1159 (5th Cir. 1976) *cert. denied*, 429 U.S. 861, 97 S.Ct. 163, 50 L.Ed.2d 139 (1976) (educational barriers to skilled labor jobs); *United States v. Georgia Power Co.*, 474 F.2d 906 (5th Cir.1973) (high school diploma required for skilled labor position at electric power plant). The *Davis* court noted that in these prior cases the educational requirements were abolished for jobs that did not require professionalism and did not involve an unusual degree of risk or public responsibility. *Davis*, 777 F.2d at 211. The court then found that the position of police officer is unlike the other positions that had previously been analyzed by the courts because it involves aspects of professionalism, public risk and responsibility. *Id.* This crucial distinction was the basis of the court's finding that the job relatedness of the college educational requirement for the position of police officer should be examined under a lighter standard than had been used in cases involving skilled laborers. In applying this lighter standard, the court found that the educational requirement was manifestly related to the police officer position requirements. *Id.*

After reviewing the requirements and responsibilities of the Supervisor II position in the instant case, this court has found that the job may at times involve high risk to the public and requires a high degree of professionalism. The Supervisor II position, like the police officer position in *Davis*, requires that the person in that position be able to function effectively as a crisis intervenor, be able to make instantaneous decisions, and have clear judgment under circumstances where there may be no clear guidelines on which to base a decision. The Supervisor II must also provide guidance for social workers under her supervision and be able to evaluate the social workers' performance.

The court finds that although some of the job-related skills that are necessary for the more routine aspects of the Supervisor II position could possibly be quantified and tested for, other aspects of the job call for skills and abilities which are especially difficult to define precisely, to test for, and to quantify. A portion of the finding by the district court in *Davis* concerning the position of police.officer is equally applicable to the position of Supervisor II:

> [C]haracteristics which must be found in an applicant [and new Supervisor II] are not easily measured in terms of statistical analyses, such as individual judgment, ability to intervene in volatile situations (i.e., domestic quarrels), ability to make important decisions, or presence and performance as a witness in court.

*Davis*, 777 F.2d at 216. Unlike many skilled and unskilled laborer jobs which rarely call for discretionary decisions, the position of Supervisor II routinely calls for the exercise of discretion under various circumstances. The Supervisor II also must have a high degree of tact, intelligence and sound judgment in making important decisions concerning the livelihood of the children and households with which she deals.

■ Because of the professional nature of the Supervisor II position and the public interest involved in the position, the court finds that empirical evidence is not required in order to validate the job-relatedness of the educational requirements for the Supervisor II position. *Compare Davis*, 777 F.2d at 217 (empirical evidence not required to validate educational requirement for police officers); *Rice v. City of St. Louis*, 464 F.Supp. 138 (E.D.Mo. 1978), *aff'd*, 607 F.2d 791 (8th Cir.1979) (college degree requirement for public health worker upheld based on expert testimony).

■ The lay testimony as well as the expert testimony of Dr. Morris in this case adequately establishes the relationship

between requirements for the Supervisor II position and college education. The testimony shows that not only is college education necessary, but also that the college course of study prescribed should be in the social sciences area. Although the evidence indicates that the college educational requirement should be more narrowly tailored to the social sciences area, the lack of this more refined requirement is not proper cause for completely abolishing the college education requirement. Rather, it is up to the personnel board to determine whether it should raise its minimum qualifications for the Supervisor II position.

### III. CONCLUSION

When professional positions such as the Supervisor II position involve dealing with the livelihood of the public and especially of children, whether directly or in a supervisory capacity, this court is of the opinion that public interest in the welfare of these individuals is paramount and justifies high employment standards, including college educational requirements.

Based upon the preponderance of the credible evidence and the applicable law, the court concludes that the educational requirement for the Supervisor II position does not have an adverse impact on women or on individuals at least 40 years of age. Even if there were such an impact, the educational requirement is sufficiently job-related to justify its continued application.

Accordingly, judgment shall be entered for the defendant.